**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 31, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SCOTT PHELAN,

      Plaintiff-Appellee,

v.

WYOMING ASSOCIATED
BUILDERS,

      Defendant-Appellant.

No. 08-8055

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D.C. NO. 07-CV-120-CAB)**

---

Timothy M. Stubson, Brown, Drew & Massey, LLP, Casper, Wyoming, for
Defendant-Appellant.

Jessica Rutzick, Rutzick Law Office, Jackson, Wyoming, for Plaintiff-Appellee.

---

Before **BRISCOE**, **BRORBY** and **McCONNELL**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

Scott Phelan, recently diagnosed with bone cancer at age twenty-six, was

covered by the healthcare plan of his former employer, which in turn was a

member of Wyoming Associated Builders, Inc. ("WAB"), a trade organization that maintained a trust to provide health insurance benefits for its members' employees. Just as Mr. Phelan was about to submit an unusually large claim relating to his cancer treatment, WAB terminated his employer's membership in the insurance trust, purportedly because that employer had submitted a payment that was both late and in the wrong form. Mr. Phelan was denied health benefits as a result. He brought a number of claims against both WAB and his employer, one of which alleged that WAB had breached its fiduciary duty, thus entitling him to equitable relief under 29 U.S.C. § 1132(a)(3) of the Employee Retirement Income Security Act (ERISA). The district court found that WAB's stated reasons for terminating Mr. Phelan's employer were a pretext for avoiding payment on Mr. Phelan's pending claim and that the termination was arbitrary and capricious. It ordered retroactive reinstatement of his employer's health care coverage as a remedy. WAB now appeals, arguing that retroactive reinstatement is a legal remedy (and thus impermissible under § 1132(a)(3)), and also that the termination was not arbitrary and capricious. We disagree on both grounds and affirm the district court.

## I. BACKGROUND

The Lock Shop of Cheyenne operates a locksmith business in Cheyenne, Wyoming. It provides health insurance for its employees through Wyoming Associated Builders, Inc., a non-profit trade organization that provides more than

-2-

fifty other businesses with health insurance for their employees. WAB, in turn, provides this coverage through the Wyoming Associated Builders Insurance Trust ("WABIT"). WABIT is administered by a board of trustees who are authorized to construe the provisions of the trust agreement, promulgate rules, and delegate ministerial powers and duties. The WABIT board hired Josh Carnahan to serve as plan administrator; Mr. Carnahan then delegated the day-to-day management of the trust to Benefit Administrators, Inc., a company owned and operated by Lynn Johnson.

Plan participants were required to pay premiums on the first day of each month. In June 2006, WABIT promulgated a late payment policy for the first time. The policy provided for both late payment penalties and eventual termination. While premiums were still due on the first of each month, "Premiums not received (postmarked) by the 10th of each month will have a 25% of premium due, up to a maximum of $500 penalty applied. The Trust Board also recommends the use of ACH [Automated Clearing House] transfers for premium payment, which is available from Benefit Administrators." Dist. Op. 8–9 (formatting omitted). As for termination, "If premiums are not paid by the 15th of the month, the Plan Administrator is notified and if premiums are still not received by the 20th of the month, the group is recommended by the Plan Administrator for termination by the Trust Board, with the termination effective retroactive back to the 1st of the month." *Id.* at 9 (formatting omitted).

The Lock Shop ran into financial difficulties in 2006 and struggled to make its payments on time. In June 2006, its premium check bounced. So did its October payment. On October 30, Lynn Johnson mailed the Lock Shop a letter informing it that its October payment had been returned for insufficient funds and requesting repayment by either money order or cashier's check. The Lock Shop made its October payment on November 6.

The Lock Shop was not the only one in bad financial shape that year. In the summer of 2006 a consultant had informed the WAB participants that use of the plan was higher than expected. In the past year, WABIT had spent almost $4.5 million paying out claims, but it had collected only a bit over $3.3 million in premiums. Two claims alone totaled over $1.2 million. Although the Trust carried stop-loss insurance that would pay claims over $75,000, the existence of such claims would have ramifications for renewal of the stop-loss policy. Terminating the Lock Shop's coverage would therefore eliminate Mr. Phelan's very expensive claim at a time when the Trust badly needed it.

In December, the Lock Shop was again behind in its payments. Ms. Johnson called the Lock Shop on December 13 and notified it that if its premium payment was not posted to the account by December 20, the Lock Shop would be terminated. Ms. Johnson also told the Lock Shop that the payment should be made by cashier's check or ACH. After scrambling to raise funds, Tami Austin of the Lock Shop mailed a personal check to WAB's bank, Hilltop National Bank,

on the afternoon of December 19. She sent the check by Federal Express, which assured her that the check would be delivered by the next morning. Unfortunately for the Lock Shop and its employees, Mother Nature intervened: a severe snowstorm hit Cheyenne that night and delayed all deliveries. The check arrived at Hilltop National Bank at 3:15 p.m. on December 20, but the snowstorm had forced the Cheyenne banks to close at noon. Thus, while Hilltop National Bank had physically received the check, it was unable to post the payment into WABIT's account until the next day.

When Ms. Johnson and Mr. Carnahan had spoken about Lock Shop the night before payment was due, Mr. Carnahan told Ms. Johnson to terminate Lock Shop if the payment was not received the next day. Benefit Administrators checked the WABIT bank account on the afternoon of December 20 and saw that no payment had posted, so it contacted Mr. Carnahan. He immediately took action to terminate Lock Shop from the plan. As soon as the Lock Shop learned of its termination it appealed to the WABIT board, explaining that the payment did indeed make it to the bank by the deadline, but that the snowstorm had unexpectedly prevented it from making it in time to be posted on that day. The trustees nevertheless denied the appeal on the grounds that the Lock Shop's payment was late and, even if it had been timely, was made by personal check rather than cashier's check or ACH.

As noted above, the Lock Shop's termination did not occur in a vacuum. WABIT was facing some serious financial liabilities, and the elimination of Mr. Phelan's claim would provide much-needed financial relief. Both Ms. Johnson and Mr. Carnahan claimed not to have been aware of Mr. Phelan's pending claim, but the district court found that this strained credulity. Ms. Johnson had spoken to Mr. Phelan's father on November 30, and on December 8—just days before the decision was made to terminate Lock Shop—Mr. Phelan's father had sent Benefit Administrators notification by certified mail that his son had been undergoing chemotherapy and radiation therapy since October and would soon have to undergo surgery to remove a cancerous tumor.

After a bench trial, the court found that it was this desire to avoid paying Mr. Phelan's expensive claim that truly motivated the Lock Shop's termination. While WAB contended that the termination was a reasonable application of its administrative policies and was necessary to ensure prompt and timely payments to the Trust, the district court found that, in truth, "the termination was prompted by a desire to avoid further financial risk to the Trust by the payment of [Mr. Phelan's] cancer expenses," Dist. Op. 30, and that "Wyoming Associated Builders' actions were a deliberate attempt to thwart the Lock Shop's payment of its premium in order to terminate the Lock Shop's ability to provide coverage for its employees." *Id.* at 29. The district court concluded that two specific interpretations of the policy by the benefits administrator were arbitrary and

capricious in the sense of being a pretext for WAB's true motivation of eliminating an expensive cancer claim: interpreting the word "received" in WAB's late payment policies as requiring that the payment be actually "posted" to the bank account, even in the midst of a huge snowstorm, and requiring that payment be made by cashier's check or ACH rather than personal check. *Id.* at 30–31. As a remedy, the court ordered WAB to "reinstate the Lock Shop's group coverage for the month of December, 2006." *Id.* at 35. At the same time, Lock Shop would have to pay WAB the December premium that would have been due had WAB not terminated it from the plan. *Id.* at 36. Doing so would effectively restore Mr. Phelan's health benefits for the month of December 2006.

WAB now appeals that decision on two principal grounds. First, it argues that a retroactive reinstatement of benefits is in fact a legal remedy masquerading as an equitable remedy, and thus beyond the authority of the court under § 1132(a)(3) of ERISA. Second, WAB argues that its decision to terminate Lock Shop was not arbitrary and capricious.

## II. DISCUSSION

### A. Is the Retroactive Reinstatement a Permissible Equitable Remedy Under § 1132(a)(3)?

ERISA is an intricately drafted statute whose civil enforcement scheme "consists of several carefully integrated provisions." *Millsap v. McDonnell Douglas Corp.*, 368 F.3d 1246, 1250 (10th Cir. 2004). One of those provisions is

29 U.S.C. § 1132(a)(3), often referred to by its public law number, § 502(a)(3), which allows a plan participant, beneficiary, or fiduciary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate *equitable relief* (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan" (emphasis added). In light of the statutory language, the Supreme Court has construed § 1132(a)(3) as allowing only "those categories of relief that were *typically* available in equity." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002) (quoting *Mertens v. Hewitt Associates*, 508 U.S. 248, 256 (1993)). While other ERISA provisions might afford a plaintiff legal relief, this provision does not. Compensatory money damages are the prototypical example of relief that was not typically available in equity. *See Mertens*, 508 U.S. at 255; *Callery v. U.S. Life Ins. Co.*, 392 F.3d 401, 404 (10th Cir. 2004); *see also* Chaim Saiman, *Restitution and the Production of Legal Doctrine*, 65 Wash. & Lee L. Rev. 993, 1009 (2008) (describing the different shades the term "equity" carries in American law, one of which is "the process of crafting remedies that do something other than award monetary damages to the plaintiff as compensation for proven losses"). *But see* John H. Langbein, *What ERISA Means by "Equitable": The Supreme Court's Trail of Error in* Russell*, Mertens, and* Great-West, 103 Colum. L. Rev. 1317, 1349–55 (2003) (criticizing the Court's holding that monetary relief was a remedy not typically available in

equity). Moreover, the Supreme Court has warned us about legal-remedies-in-equitable-clothing, such as an "injunction" to pay damages. *See Great-West*, 534 U.S. at 210 ("Almost invariably . . . suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty.") (quotations omitted). We must therefore look beyond the label on the remedy and ask whether its substance is equitable or legal. *Cf. Normandy Apts., Ltd. v. U.S. Dept. of Housing and Urban Development*, 554 F.3d 1290, 1297 (10th Cir. 2009) (examining the substance of an injunction to determine whether it was "equitable," and thus subject to the Tucker Act's limited waiver of sovereign immunity, or "legal," in which case immunity would bar suit).

The district court ordered "reinstatement" of the Lock Shop's coverage for the month of December, 2006. Although reinstatement sounds equitable, in that it requires the defendant to take some future action, WAB contends that reinstatement of past coverage is retroactive in focus, compensatory in nature, and tantamount to an injunction to pay Mr. Phelan damages in the amount of his medical bills. We do not agree. In *Downie v. Indep. Drivers Assoc. Pension Plan*, 934 F.2d 1168, 1170 (10th Cir. 1991), we upheld the reinstatement of pension benefits as a permissible equitable remedy under § 1132(a)(3). To be

sure, as WAB points out, *Downie* was a case where the reinstatement restored the pensioner's benefits going forward and hence had the effect of allowing him to receive future benefits; it did not simply pay compensation for past harms. *See Callery v. U.S. Life Ins. Co. in the City of New York*, 392 F.3d 401, 407 (10th Cir. 2004) ("In *Downie*, the court used its equitable powers to restore the parties to their original positions in order to affect the beneficiary's ability to receive future payments."). WAB argues that unlike the prospective reinstatement in *Downie*, the reinstatement of Lock Shop's December coverage was purely retrospective and would result simply in WAB compensating Mr. Phelan for medical expenses he has already incurred.

We agree with WAB that remedies, despite their seemingly equitable form, are generally regarded as legal if they have a retrospective focus. *See id.* (claim rejected where claimant sought "equitable relief providing for payment of the insurance on the life of [her husband]" and "to enjoin the defendants from not paying her the life insurance benefits" because she was essentially "seek[ing] payment of the policy proceeds"); *Millsap*, 368 F.3d at 1252 (backpay is "remedially analogous to personal injury or breach of contract claims because backpay awards compensate employees for lost wages and benefits before trial"); *see also Calhoon v. Trans World Airlines*, 400 F.3d 593, 598 (8th Cir. 2005) (reimbursement for medical bills and costs that would have been covered by COBRA plan had the plan not been terminated was legal, not equitable). But

reinstatement of the Lock Shop policy in this case would have prospective effect, just as in *Downie*. Assuming that Lock Shop is able to continue to pay the premiums on its policy, Lock Shop employees will continue to enjoy health care coverage into the future. Indeed, at the time Mr. Phelan filed his lawsuit, the relief he requested was entirely prospective in nature, with no retrospective element at all.

The remedy imposed by the district court in this case does not track the plaintiff's specific injuries, but is instead both broader and narrower. It reinstates coverage for *all* Lock Shop employees, not just Mr. Phelan, but it also fails to guarantee that WAB will even pay Mr. Phelan's medical costs. As the reinstatement is contingent upon Lock Shop paying its December premium, the possibility remains that the Lock Shop will fail to do so and Mr. Phelan will remain uncovered. Whether Mr. Phelan's medical costs will be paid depends on a number of contingencies, including his own timely submission of the claims. All of this shows that the true yardstick of the court's remedy was not Mr. Phelan's past injuries but rather WAB's prospective gain.

By ordering reinstatement, the court was not ordering WAB to reimburse Mr. Phelan for his past losses, even if such a reimbursement might very well be one practical consequence of the reinstatement. Instead, the court ordered WAB to proceed as if the Lock Shop had not been wrongfully terminated from the plan for the month of December. It was WAB that had benefitted from that

termination, not only because it avoided paying Mr. Phelan's claim but also because it avoided paying *all* potential Lock Shop claims and also avoided the accounting consequences (such as higher reinsurance premiums) of having a long-term cancer patient on its books. By ordering reinstatement, the court unwound this unlawful gain. The fact that the plaintiff was one victim of the unlawful action and, consequently, a beneficiary of the remedy, does not make this reinstatement substantively legal in nature. The reinstatement was an equitable remedy and was therefore permissible under § 1132(a)(3).[1]

## B. Was the Termination Arbitrary and Capricious?

"When an ERISA plan grants a plan administrator (or its delegate) discretion in administering the plan, we will uphold its decisions unless they are arbitrary and capricious." *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 801 (10th

---

[1]WAB has also appealed the district court's denial of its motion for a continuance in order to conduct discovery into the remedial theory of reinstatement, which WAB described as a "new" remedial theory. The district court disagreed that this was a new theory and found that WAB had been on notice of the theory for some time. We review denials of a continuance for abuse of discretion, and as the district court considered the relevant factors such as the likelihood a continuance would accomplish its purpose, the diligence of the party seeking the continuance, and the inconvenience to the opposing party, we cannot say the court abused its discretion here. WAB moved for a continuance only three days before trial, at which point it had indisputably been on notice at least a month, and it was unclear that additional time would allow it to uncover any additional evidence. *See Rogers v. Andrus Transp. Services*, 502 F.3d 1147, 1151 (10th Cir. 2007).

Cir. 2004).[2]  Both parties agree that arbitrary and capricious review governs this case.[3]  Under this arbitrary and capricious standard, we ask whether the administrator's decision was "reasonable and made in good faith."  *Flinders v. Workforce Stab. Plan of Phillips Petrol. Co.*, 491 F.3d 1180, 1193 (10th Cir. 2007) (citing *Fought v. Unum Life Ins. Co. of America*, 379 F.3d 997, 1003 (10th Cir. 2004)).  While "[t]he district court's determination of whether a plan administrator's decision is arbitrary and capricious is a legal conclusion subject to de novo review," *Rekstad v. U.S. Bancorp*, 451 F.3d 1114, 1119 (10th Cir. 2006), we defer to any underlying factual determinations unless they are clearly

---

[2]Even if the trust administrators operated under a conflict of interest, as Mr. Phelan argues, this would not alter the standard of review.  *See Metropolitan Life Ins. Co. v. Glenn*, --- U.S. ----, 128 S.Ct. 2343, 2350 (2008) ("We do not believe that *Firestone's* statement [that a conflict of interest should be taken into account on judicial review of a discretionary benefit determination] implies a change in the *standard* of review, say, from deferential to *de novo* review.").  Instead, a conflict of interest is one of several factors that a judge can consider when deciding whether the decision was indeed arbitrary and capricious.  *Id.* at 2351.

[3]The concurrence contends that the ERISA plan did not grant the administrators discretion in administering the plan and that the district court should have therefore reviewed Lock Shop's termination de novo.  Neither party has argued this, and in fact Mr. Phelan, who would surely prefer de novo review, states that the "district court . . . applied the appropriate standard of review." Aple. Br. 30.  Even aside from this, the plain language of the plan states that the Plan Administrator "shall have maximum legal discretionary authority to construe and interpret the terms and provisions of the Plan, . . . to decide disputes which may arise relative to a Plan Participant's rights, and to decide questions of Plan interpretation and those of fact relating to the plan."  App. 260.  This broad grant of discretion would seem to include the decision to terminate a plan participant for failure to make timely payments and, in the absence of either party arguing it does not, we see no reason to think otherwise.

erroneous.  *See King v. PA Consulting Group, Inc.*, 485 F.3d 577, 585 (10th Cir. 2007).  We especially give "due regard to the [district] court's opportunity to judge the credibility of witnesses."  *Creative Consumer Concepts, Inc. v. Kreisler*, 563 F.3d 1070, 1078 (10th Cir. 2009); *see also Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985) ("But when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.").  As WAB's plan granted discretion to its administrator and delegates, we review whether its decision to terminate Lock Shop from the plan was arbitrary and capricious, though we defer to the district court's specific factual findings and credibility determinations.

WAB asserted two independent bases for Lock Shop's termination: Lock Shop's failure to submit its premium payment in time for it to be posted on December 20 and its failure to pay by cashier's check.  The district court found that both grounds were pretexts to avoid payment of Mr. Phelan's claim.  It also evaluated each ground under the so-called *Flinders* factors:

> [Whether] (1) the decision was the result of a reasoned and principled process, (2) is consistent with any prior interpretations by the plan administrator, (3) is reasonable in light of any external standards, and (4) is consistent with the purposes of the plan.

*Flinders*, 491 F.3d at 1193 (quoting *Fought*, 379 F.3d at 1003) (quotations omitted). (We in fact first articulated the *Flinders* factors in *Fought*, inspired in part by the three-factor test recommended in Kathryn J. Kennedy's *Judicial Standard of Review in ERISA Benefit Claim Cases*, 50 Am. U. L. Rev. 1083, 1135, 1172 (2001), which in turn was inspired by an *eight*-factor test of the Fourth Circuit, *Booth v. Wal-Mart Stores, Inc. Assoc. Health and Welfare Plan*, 201 F.3d 335, 342 (4th Cir. 2000).) As with other installments in the American judiciary's long-standing love affair with multi-factor tests, the *Flinders* factors attempt to create a workable checklist that can replace the essential (albeit somewhat abstract) inquiry of whether or not the decision was reasonable. The danger with such tests is that the essential inquiry gets lost amid the factors, which in turn take on a life of their own. Here, for instance, the district court held that WAB's decision to terminate the Lock Shop failed each of the *Flinders* factors and was therefore unreasonable. The problem is that while we ultimately agree that this particular decision was unreasonable, the *Flinders* factors do not seem to get us there.

Take the decision to terminate because the payment was not timely received. The plan's late payment policy provided that "if premiums are still not *received* by the 20th of the month, the group is recommended by the Plan Administrator for termination by the Trust Board." (Emphasis added). Dist. Op. 27. Elsewhere in the policy, the word "received" is explicitly defined to mean

-15-

"postmarked": the policy states that "[p]remiums not received (postmarked) by the 10th of each month will have a 25% of premium due." *Id.* (formatting omitted). That could suggest that "received" carries the same meaning elsewhere in the policy, but the very need to specify that "received" means "postmarked" in one place could also suggest the word carries a different meaning in other places. WAB claims to have resolved this ambiguity in favor of an interpretation that meant "posted to the trust's bank account" rather than physically received or postmarked. The district court found that interpretation objectively unreasonable based upon each *Flinders* factor.

First, the court found that the interpretation of "received" to mean "posted" was not the result of a "reasoned and principled process." Dist. Op. 27–28. Plan administration is not notice and comment rule-making, though, and many interpretations will by nature be responses to unexpected situations. Ms. Johnson, the plan delegate, interpreted the word as meaning "posted," informed Lock Shop of this interpretation, and informed the board of this interpretation before the board decided to terminate. We are not sure what additional "process" would have pushed the balance toward reasonableness. It might be that the ad hoc nature of the decision does not *insulate* WAB's decision-making from closer scrutiny, but it does not strike us as strong evidence that the decision *must* have been unreasonable.

As for the second factor, the district court found that the interpretation was not "consistent with any prior interpretations by the plan administrator" because the Lock Shop had not been terminated for submitting payments after the 20th in the past. Dist. Op. 28. The logic of this would seem to punish plan administrators for accommodating plan participants and discourage them from ever making exceptions for fear that doing so would lock them into repeating those accommodations in the future. The third factor—that the interpretation was not "reasonable in light of any external standards"—likewise seems inconclusive. The district court pointed to other fields where "receipt" is deemed to occur on the date an item is postmarked, such as the Wyoming Rules of Civil Procedure, which construe a document to be filed on its postmark date. Dist. Op. 29 (citing *Fullmer v. Wyoming Employment Sec. Com'n*, 858 P.2d 1122, 1124 (Wyo. 1993)). This shows that interpreting "received" to mean "postmarked" is not unreasonable, but it does not definitively preclude other interpretations.

The fourth factor—that the termination was not "consistent with the purposes of the plan"—also offers little help in interpreting the word "received." While the purpose of the plan might be to "provide affordable group health insurance benefits for eligible employees," Dist. Op. 29, not every decision that results in the denial of an insured's benefits conflicts with that purpose. "[A] fiduciary obligation, enforceable by beneficiaries seeking relief for themselves, does not necessarily favor payment over nonpayment," *Varity Corp. v. Howe*, 516

-17-

U.S. 489, 514 (1996), as an administrator also has a duty to "preserve assets to satisfy future, as well as present, claims and requires a trustee to take impartial account of the interests of all beneficiaries." *Id.* It is easy to be sympathetic to the claimant standing before the court, but we must also perform the more difficult task of remembering the faceless beneficiaries who are not now before us but who nonetheless depend upon seemingly technical administrative deadlines that are vital for ensuring sufficient funds to cover potential future claims. The fact that WAB's interpretation of "received" resulted in the loss of one person's benefits does not necessarily mean it violated the purposes of the plan.

We thus find ourselves in a situation where a term in the plan is ambiguous and application of the *Flinders* factors does not definitively counsel one interpretation over another. As an objective matter, WAB would seem to be operating within the realm of reasonableness in interpreting the word "received" to mean "posted." It is at this point, though, that we must remind ourselves of the essential inquiry at hand: whether the decision was "reasonable and made in good faith." *Fought*, 379 F.3d at 1003. While WAB's interpretation of the policy language might have been within some objective zone of reasonableness, it would most certainly not be reasonable to adopt this reasoning as a rascally pretext for avoiding the expensive claim of one of its beneficiaries. The district court found as a factual matter that this was, in fact, what happened.

The court found that Ms. Johnson, Mr. Carnahan, and the WABIT board all knew of Mr. Phelan's pending claim. It found their testimony to the contrary suspicious and not credible. Dist. Op. 30. Despite the contention that the Lock Shop was fired for violating the late payment policy, the court found that, in fact, "the termination was prompted by a desire to avoid further financial risk to the Trust by the payment of [Mr. Phelan's] cancer expenses." *Id.* We must accept this factual determination unless it is clearly erroneous, and the context of the termination supports the finding. Lock Shop mailed sufficient payment to WABIT's bank, and that payment physically arrived by the December 20 deadline. It would have arrived in time to be *posted* on that same day, but for an unexpectedly severe snowstorm that shut down the city of Cheyenne. While Ms. Johnson might not have known that the bank had physically received Lock Shop's payment that day, the board certainly knew this by the time the Lock Shop was officially terminated. Nonetheless, the board chose to take advantage of ambiguous administrative rules in order to relieve itself of an expensive claim at a time the trust was experiencing serious financial problems. Interpreting the word "received" to mean "posted" might be objectively reasonable, but choosing this interpretation over equally reasonable alternatives solely in order to cut loose an expensive claim does not satisfy the obligations of good faith that plan administrators owe their fiduciaries.

Having found that the actual motivation for the Lock Shop's termination was avoidance of Mr. Phelan's claim, the district court was correct that the termination was arbitrary and capricious. The *Flinders* factors, unfortunately, are not very helpful in ferreting out situations where a plan administrator hides behind an objectively reasonable rationale to justify an action taken in subjective bad faith. This explains why the district court's effort to reach the appropriate result through the factors ultimately seems strained. This is not to say that the factors had no relevance at all here—while they did not dispel WAB's interpretation as being entirely outside the zone of reasonableness, they did demonstrate that its interpretation was not the only or even the most reasonable meaning. That further bolstered the ultimate conclusion that the termination was not the straightforward application of a clear administrative rule, but that instead an ambiguous administrative rule provided a pretext for WAB to eliminate coverage for one of its costlier beneficiaries. "While a fiduciary has a duty to protect the plan's assets . . . it also has a duty to see that those entitled to benefits receive them. It must consider the interests of deserving beneficiaries as it would its own." *Gaither*, 394 F.3d at 807–08. Exploiting ambiguous rules for the purpose of denying coverage is arbitrary and capricious.

The same is true of the second basis for termination the district court found to be arbitrary and capricious: that termination was justified because payment was made by personal rather than cashier's check. WAB derived that supposed

requirement not from any written policy language but from an unwritten and internal rule of Ms. Johnson. Dist. Op. 14–15. Ms. Johnson did inform Lock Shop that its October late payment would need to be paid by cashier's check as its prior check had bounced, but even Mr. Carnahan admitted that whether *future* payments needed to be made by cashier's check was ambiguous. *Id.* at 16. More importantly, though, even if it was reasonable to require payment by cashier's check, it does not escape the fact that the district court found that the true reason for the termination was to avoid paying Mr. Phelan's claim. We note also that the personal check Lock Shop submitted had adequate funds and cleared without difficulty, which makes termination for failure to pay by cashier's check all the more suspect.

Accepting the district court's factual determination that Lock Shop's termination was an attempt to avoid payment on Mr. Phelan's claim, we agree that the termination was arbitrary and capricious and that reinstatement of Lock Shop's December coverage was an appropriate equitable remedy.

## III. CONCLUSION

We therefore **AFFIRM** the decision of the district court.

08-8055, Phelan v. Wyoming Associated Builders

**BRISCOE, J.,** Circuit Judge, concurring.

I concur in the result, but write separately to make two points regarding the assertion by Wyoming Associated Builders, Inc. (WAB) that the decision to terminate The Lock Shop from the insurance trust was neither arbitrary nor capricious.

*Standard of review*

First, I am not persuaded, as is the majority, that we are obligated to review the termination decision under the more onerous arbitrary and capricious standard of review. Instead, for the reasons outlined below, I conclude de novo review applies in this instance.

The majority places great weight on the fact that "[b]oth parties agree that arbitrary and capricious review governs this case." Maj. Op. at 13. But this ignores the "well-settled [principle] that a court is not bound by stipulations of the parties as to questions of law," including the appropriate standard of review. Koch v. U.S. Dep't of Interior, 47 F.3d 1015, 1018 (10th Cir. 1995); see United States v. Vontsteen, 950 F.2d 1086, 1091 (5th Cir. 1992) (en banc) ("No party has the power to control our standard of review."); Jones v. Metro. Life Ins. Co., 385 F.3d 654, 660 n. 4 (6th Cir. 2004) ("Typically, parties may not determine by agreement [a court's] standard of review."). Thus, we must resolve for ourselves, based upon controlling precedent and the relevant facts of this case, what the proper standard of review is in this case.

Generally speaking, a denial of benefits under an ERISA-governed plan "is to be reviewed under a de novo standard unless the . . . plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). If, however, the plan at issue confers such discretion, then, absent procedural irregularities, we review the administrator's decisions under an arbitrary and capricious standard. See Kellogg v. Metro. Life Ins. Co., 549 F.3d 818, 825-26 (10th Cir. 2008). These general standards of review also appear to apply where, as here, there has not been a specific denial of benefits, but rather an employer has been terminated from an ERISA-governed plan. Cf. Paneccasio v. Unisource Worldwide, Inc., 532 F.3d 101, 108 (2d Cir. 2008) (applying same standards of review to board of directors' decision to terminate altogether an ERISA-governed plan).

The Plan at issue in this case states, in pertinent part, that "[i]t is the express intent of this Plan that the Plan Administrator, or its designee, shall have maximum legal discretionary authority to construe and interpret the terms and provisions of the Plan, to make determinations regarding issues which relate to eligibility for benefits, to decide disputes which may arise relative to a Plan Participant's rights, and to decide questions of Plan interpretation and those of fact relating to the Plan." App. at 260. Notably, however, the Plan focuses exclusively on the eligibility of participating individuals for medical benefits, and

thus is silent with respect to the payment of premiums by participating employers, as well as with respect to the termination of employers from the Plan. Further, although it is uncontroverted that the trustees adopted a formal written "late payment" policy in the spring of 2006, nothing in the record on appeal indicates that policy was intended to be part of the Plan. Nor did that "late payment" policy grant the Plan administrator or trustees discretion to interpret its terms (or the terms of the Plan). Lastly, the "late payment" policy afforded the Plan administrator authority only to "recommend" termination, and provided that the ultimate decision on termination would be made by the trustees; it is uncontroverted that this procedure was not followed in terminating The Lock Shop.[1]

Although the written agreement that formed the Trust contains various provisions regarding the "Powers" and "Duties" of the trustees, it likewise is silent with respect to the payment of premiums by employers and the termination of employers from the Plan. Thus, it cannot reasonably be said that this document confers discretionary authority on the trustees to resolve employer terminations.

---

[1] The record on appeal indicates that The Lock Shop was actually terminated from the Plan by Josh Carnahan, the Plan administrator, and that the trustees simply "affirmed" Carnahan's decision in denying The Lock Shop's appeal. That procedure, however, was not authorized by the "late payment" policy adopted by the trustees. Rather, as noted, Carnahan's role under the "late payment" policy was merely to "recommend" termination, and the decision whether or not to actually terminate was supposed to rest solely with the trustees.

For these reasons, I conclude that a de novo standard of review applies to the decision to terminate The Lock Shop from the insurance trust.

*Merits of the termination decision*

As for the merits of the termination decision, I conclude The Lock Shop did not, in making its December 2006 premium payment, violate the late payment policy adopted by the board of trustees on June 1, 2006.  That policy reads as follows:

Late Payment Penalties:

> The WABIT program is a partial self-funded Trust administered under Federal ERISA guidelines.  As such, the timelines [sic] of premium payments is extremely important.  Due to some abuses, there will be an immediate implementation of a late payment penalty if premiums are not received timely plus a reasonable grace period.  Premiums are due on the first (1st) of each month.  Premiums not received (postmarked) by the 10th of each month will have a 25% of premium due, up to a maximum of $500 penalty applied.  The Trust Board also recommends the use of ACH transfers for premium payment, which is available from Benefit Administrators [the entity retained by the Trust to perform administrative functions for the Trust, including collection of premiums].

Termination Procedures:

> The WABIT program is a partial self-funded Trust administered under Federal ERISA guidelines and there is NOT a premium due grace period.  Premiums are due on the first of each month.  If premiums are not received by the 10th of each month in which they are due, claim payment will be suspended and a phone call will be made as well as penalties applied.  If premiums are not paid by the 15th of each month, the Plan Administrator is notified and if premiums are still not

> received by the 20th of the month the group is recommended by the Plan Administrator for termination by the Trust Board, with the termination retroactive back to the 1st of each month.

Id. at 272.

I agree with the district court that the term "received" is expressly defined in the fifth sentence of the Late Payment Penalties provision of the policy to mean "postmarked." Under that definition, The Lock Shop's December premium payment was "received" by WAB and its agents on December 19, 2006, when Tami Austin placed it in the hands of Federal Express for delivery to Hilltop Bank on the morning of December 20, 2006. Thus, the premium payment was timely "received" under the terms of the late payment policy.

As for The Lock Shop's purported failure to pay its December 2006 premium via certified check or the "ACH" method of payment, no such requirement appears in the late payment policy or elsewhere in the Plan. Instead, the "Late Payment Penalties" provision of the late payment policy simply states that "The Trust Board . . . recommends the use of ACH transfers for premium payment . . . ." Id. (emphasis added). Thus, The Lock Shop's use of a regular check, which I note was backed by sufficient funds in The Lock Shop's account, was entirely proper.