**PUBLISH**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 5, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

WILLIAM FOSTER,

        Plaintiff - Appellant,

v.

PPG INDUSTRIES, INC., a corporation;
PPG INDUSTRIES EMPLOYEE
SAVINGS PLAN, an ERISA plan,

        Defendants-Third-Party-
        Plaintiffs - Appellees,

and

PATRICIA FOSTER,

        Third-Party-Defendant.

No. 10-5123

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. No. 4:06-CV-00423-GKF-TLW)**
_____

Steven R. Hickman, Frasier, Frasier & Hickman, LLP, Tulsa, Oklahoma, for Plaintiff-Appellant.

John H. Tucker (Randall E. Long, with him on the brief), Rhodes, Hieronymus, Jones, Tucker & Gable, Tulsa, Oklahoma, for Defendant-Third-Party-Plaintiff-Appellees.

_____

Before **HARTZ**, **EBEL**, and **HOLMES**, Circuit Judges

_____

**EBEL**, Circuit Judge.

Plaintiff-Appellant William Foster ("Foster") sued his former employer, Defendant-Appellee PPG Industries, Inc. ("PPG"), and Defendant-Appellee the PPG Industries Employee Savings Plan (the "Plan") (collectively, "Defendants") under the Employee Retirement Income Security Act ("ERISA") to recover Plan benefits allegedly due him after Foster's ex-wife fraudulently withdrew Foster's entire Plan account balance. The district court upheld the decision of the Plan Administrator, who had determined that the Plan was not liable to reimburse Foster for the fraudulently withdrawn benefits. Foster appeals. Exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM.

## I.     BACKGROUND

### A.     Foster's employment, marital, and residential history

Foster was employed by PPG from October 1988 to October 20, 1999. While employed by PPG, Foster participated in the Plan. The Plan is a 401(k) employee stock ownership plan, governed by ERISA, consisting of employee contributions matched in part by employer contributions. When Foster separated from PPG employment, his rights in his Plan account balance were fully vested. Foster did not elect to withdraw his money from his Plan account when his employment terminated, but rather deferred receipt of his benefits, thereby remaining a Plan participant.

2

Foster was married to Patricia Foster[1] from 1993 until July 27, 2004, when the couple divorced. During their marriage, the Fosters lived together at 12401 East 33rd Place, in Tulsa ("the marital residence"). When Foster left his employment with PPG in 1999, he still resided at the marital residence, and this address remained on file with PPG as Foster's permanent address. In early July 2004, prior to the finalization of the divorce, Foster moved out of the marital residence, but Foster did not change his permanent address on file with PPG and the Plan until September 21, 2005. Ms. Foster continued to live at the marital residence. At no time between July 2004 and September 2005 did Foster file an official change of address form with the U.S. Postal Service or otherwise notify PPG or the Plan of his change of address.

B.    **Activity on Foster's Plan account**

Even before Foster had moved out of the marital residence, PPG had implemented automated systems for Plan participants to access their accounts, and notified Plan participants of how to use these systems. These systems used a combination of Social Security numbers and Personal Identification Numbers ("PINs") to protect participants' accounts. PPG had also notified participants that it would soon be introducing enhanced security measures to "address the increasing concern around possible identity theft and data privacy." Aplt. App. at 314. These new measures included the use of unique User IDs rather than Social Security numbers and more complex password requirements.

---

[1] For clarity, this opinion will refer to William Foster as Foster. It will refer to Patricia Foster as "Ms. Foster."

3

In March 2005, PPG mailed information on how to establish a new User ID and password, marked "To Be Opened By Addressee Only," to the marital residence. Id. at 288, 538. Ms. Foster received the document and used the information it contained, along with Foster's Social Security number, to attempt to gain access to Foster's account online. In accordance with its procedures, PPG processed the password reset request and sent it to the "permanent address on file," i.e., the marital residence. Id. at 32. On May 8, 2005, armed with the new password and Foster's Social Security number, Ms. Foster created a User ID, password, answers to security questions, and beneficiary designation on Foster's account, changed the mailing address on the account to her P.O. box, and requested a withdrawal of $4,000, to be directly deposited to a numbered account at the Bank of Oklahoma. PPG processed the request on May 9, 2005. By September 13, 2005, Ms. Foster had emptied the account, $42,126.38 in all.

## C.    Foster's Dealings with PPG

In September 2005, Foster contacted the Plan service center by phone and updated his mailing address. During the call, Foster apparently did not inquire as to the balance of his account, nor was he told his account was empty. Foster first became aware of the withdrawals from his account in January 2006, when he received at his new home address a 2005 Form 1099-R from Fidelity Investments reporting a distribution of $42,126.38. On January 30, 2006, Foster sent a letter to the "PPG Plan Administrator," reporting that he had received a 1099-R and "claiming potential fraud, as I did not request withdrawal from my plan and I did not authorize any disbursement from this plan." Id. at 24.

4

The Plan Administrator's designate, Adrianne Scott, responded on March 6, 2006. She told Foster that PPG was reviewing his account activity and "seeking guidance from PPG's outside legal counsel as to what steps need to be taken next to investigate your claims." Id. at 25. She promised to keep Foster "abreast of the results of our review." Id. In subsequent communications between Foster and Scott, Foster "did admit that his ex-wife had admitted to withdrawing the funds from his account." Id. at 380. Nevertheless, Foster wrote a second letter on May 30, 2006, stating "I did not request or authorize the above referenced disbursement in 2005 and demand that the full amount of $42,126.38 be put back into my plan, and the 1099R for same be rescinded." Id. at 26.

On May 31, 2006, Scott wrote to Foster to tell him that "outside legal counsel has determined that the Plan is not liable for the events that took place, as proper security measures were in place to ensure the safety of participants' assets in the Plan." Id. at 27. Scott stated that the Plan would "make a reasonable attempt to recover the distributed amount from your ex-wife," and that if it could not recover the amount, it would re-issue the 1099-R in Ms. Foster's name. Id. The letter acknowledged Foster's "very unfortunate situation," and advised him that he might pursue legal action against Ms. Foster.[2] Id. Finally, the letter encouraged Foster to write to the Plan Administrator if he

_____

[2] Foster did not pursue any legal action against Ms. Foster. In her deposition, Ms. Foster stated that she believed that Foster had given her permission to use the money in the account, both because he had not changed his address with PPG, and because he wanted to reconcile. Foster told Ms. Foster in April 2006 that "he knew [she] had taken [the money] and why [she] had taken it," and that he would not go through with his suit against PPG if she "came back to him." Aplt. App. at 408. Ms. Foster also testified that Foster told her that he was suing PPG, rather than her, because Foster "knew I didn't have any money and you guys [PPG] did." Id. Foster, in his deposition, testified that he

wished to discuss the matter further, and in the meantime to call Scott with any questions. Scott reiterated the Plan's position in a letter of July 28, 2006.

## II.    Procedural Background

Foster filed suit against PPG and the Plan in the Northern District of Oklahoma on August 15, 2006. In his amended complaint he asserted two distinct ERISA violations, albeit without reference to specific statutory provisions. First, Foster alleged that he had demanded, but Defendants had refused to pay, "distribution of his share of the [P]lan," id. at 12, which we construe as a claim under 29 U.S.C. § 1132(a)(1)(B).[3] Second, Foster alleged that he had "sought information from Defendants regarding the plan, to which he is entitled under ERISA, and which has not been furnished to him," Aplt. App. at 12, which we construe as a claim under 29 U.S.C. § 1132(a)(1)(A).[4] Defendants impleaded Ms. Foster as a third-party defendant on December 19, 2006. Following amendment of Foster's complaint, discovery, the parties' joint submission of an Administrative Record, and a hearing before a magistrate judge developing the Administrative Record, the district court remanded the case to the Plan Administrator on Defendants' motion.

did not sue Ms. Foster to recover the money because he "felt she had no money," id. at 442, and indeed, Ms. Foster admitted that she had spent it all.

[3] 29 U.S.C. § 1132(a)(1)(B) provides for a civil action by a plan participant "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

[4] 29 U.S.C. § 1132(a)(1)(A), by reference to 29 U.S.C. § 1132(c), provides that a Plan Administrator "may in the court's discretion be personally liable to [a] participant . . . in the amount of up to $100 a day" for failure or refusal to supply requested information. Citing an absence of prejudice or bad faith, as well as the fact that Foster ultimately received the requested information, the district court declined to impose any such penalty. Foster does not appeal this determination.

On May 9, 2008, Plan Administrator G. Thomas Welsh, PPG's Director of HR Services and Benefits, issued a formal determination to Foster, "in light of the Court's order [and] considering [Foster's] claim as a request for payment of benefits for the full amount in controversy." Id. at 537. The Administrator denied Foster's request for "additional benefits" on the grounds that "[1] the Plan had in place all the necessary and proper security measures, [2] the benefits were paid in accordance with all Plan terms and requirements, and [3] [Foster's] loss of benefits was due to [Foster's] own failure to comply with [the Plan's address change requirements] and the fraudulent conduct of Ms. Foster." Id.

Foster challenged this determination in the district court. As pertinent to this appeal, Foster argued below (1) that the Plan Administrator's decision should be reviewed de novo, and (2) that because Foster had not personally requested or received his money, and because the money had instead been paid to another, the money had been "forfeited" in violation of 29 U.S.C. § 1053(a). The district court, applying a deferential arbitrary-and-capricious standard of review, upheld the Administrator's decision. It further determined that "nonforfeitable" as defined in 29 U.S.C. § 1002(19) had no application to a situation in which the loss of benefits was due to the wrongful action of third parties. Foster now appeals.

## II.    DISCUSSION

### A.    Standard of Review

This Court reviews the "plan administrator's decision to deny benefits to a claimant, as opposed to reviewing the district court's ruling." Holcomb v. Unum Life Ins. Co. of Am., 578 F.3d 1187, 1192 (10th Cir. 2009). In reviewing the administrator's actions, we are "limited to the administrative record—the materials compiled by the administrator in the course of making his decision." Id. (internal quotation marks omitted).

We will "review a denial of plan benefits 'under a de novo standard' unless the plan provides to the contrary." Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 111 (2008) (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)). Where the plan confers upon the administrator discretionary authority to determine eligibility for benefits or to interpret plan terms, "a deferential standard of review is appropriate." Id. (internal quotation marks omitted). In such cases we review the administrator's decision for abuse of discretion. See id. This Court treats the abuse-of-discretion standard and the arbitrary-and-capricious standard as "interchangeable in this context," and "applies an arbitrary and capricious standard to a plan administrator's actions." Fought v. Unum Life Ins. Co. of Am., 379 F.3d 997, 1003 & n.2 (10th Cir. 2004) (per curiam) (internal quotation marks omitted), abrogated on other grounds by Glenn, 554 U.S. 105 (2008).

Where the plan administrator is "operat[ing] under a conflict of interest, . . . that conflict" may be weighed "as a factor in determining whether the plan administrator's actions were arbitrary and capricious." Charter Canyon Treatment Ctr. v. Pool Co., 153

F.3d 1132, 1135 (10th Cir. 1998). A plan administrator acting in a dual role, i.e., both evaluating and paying claims, has such a conflict of interest. Glenn, 554 U.S. at 112. In such cases, we apply "a combination-of-factors method of review that allows judges to take account of several different, often case-specific, factors, reaching a result by weighing all together." Holcomb, 578 F.3d at 1193 (internal quotation marks and alterations omitted) (citing Glenn, 554 U.S. at 117). "[W]e will weigh the conflict of interest as a factor in our abuse of discretion analysis, and we will weigh it more or less heavily depending on the seriousness of the conflict." Murphy v. Deloitte & Touche Grp. Ins. Plan, 619 F.3d 1151, 1157 n.1 (10th Cir. 2010).

Here, the parties do not dispute that Section 15.2(A) of the Plan grants the Plan Administrator "complete authority," inter alia, to "determine eligibility for benefits," "make factual findings," "construe the terms of the Plan," and "control and manage the operation of the Plan." Aplt. App. at 132. We therefore evaluate the Plan Administrator's decision—i.e., that the Plan should not reimburse Foster's Plan account for the amount Ms. Foster withdrew—under the deferential arbitrary-and-capricious standard. We weigh, as a factor in that analysis, the Plan Administrator's inherent conflict of interest, and ask only whether the Plan Administrator abused his discretion.

"[C]onflict of interest . . . should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision . . . . It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy." Glenn, 554 U.S. at 117. Following this guidance, we give the Plan Administrator's

9

inherent conflict of interest minimal weight in this analysis. See Murphy, 619 F.3d at 1157 n.1. The circumstances do not suggest a "higher likelihood" that the inherent conflict "affected the benefits decision." As an initial matter, we note that the initial "benefits decision" was the decision to process account withdrawals upon receipt of a procedurally sound request. The record shows that the disbursements were made promptly and without difficulty. In other words, to the extent that the Plan's self-interest would have dictated keeping the money at the time the initial benefits decision was made, the Plan did not keep the money, but rather paid the money when requested in accordance with its procedures.

To the extent that the "benefits decision" we evaluate here was the ultimate decision not to reimburse Foster's Plan account, the record shows that the Plan Administrator took "active steps to reduce potential bias and promote accuracy." Glenn, 554 U.S. at 117. The Plan sought outside counsel in the matter, and conducted an investigation. The Plan Administrator permitted Foster to appeal its initial determination. For all these reasons, the Plan Administrator's inherent conflict of interest is of minimal importance to our analysis, and does not alter our conclusion that there was no abuse of discretion. See id.; Murphy, 619 F.3d at 1157 n.1.

## B. Nonforfeitability

Before evaluating the Plan Administrator's decision, we first address Foster's legal contention that because he personally never received his money, the Plan Administrator's decision violated ERISA's nonforfeitability provision, 29 U.S.C. §

1053(a). The district court concluded that ERISA's nonforfeitability provisions could not be interpreted to mean that the plan must act as "insurer against any and all wrongful actions by third parties." Aplt. App. at 608 (Order at 6). The district court's interpretation of ERISA is a question of law that this Court reviews de novo. See Kellogg v. Energy Safety Servs. Inc., 544 F.3d 1121, 1125 (10th Cir. 2008). We conclude there was no prohibited forfeiture.

### 1. Forfeiture generally

A "forfeiture" is the "divestiture of property without compensation." Black's Law Dictionary (9th ed. 2009). In the benefits context, we generally think of a benefit as "forfeited" where it disappears, to the employer's or promisor's gain, usually because of some prohibited action on the part of the employee/promisee. See, e.g., 38 U.S.C. § 6103(a) (providing that a person who commits fraud in connection with a claim to veteran's benefits "shall forfeit all rights, claims, and benefits under all laws administered by the Secretary"); id. § 6104(a) (same for a person who commits treason); Hobbie v. Unemployment Appeals Comm'n of Fla., 480 U.S. 136, 144 (1987) (describing loss of right to state unemployment benefits because of for-cause termination as a "forfeiture of unemployment benefits"); Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 481 (1992) (describing loss of right to compensation and medical benefits under the Longshore and Harbor Workers' Compensation Act for failure to comply with statutory provisions regarding third-party settlements as a "forfeiture of future benefits"); cf. Thompson v. Clifford, 408 F.2d 154, 169 & n.10 (D.C. Cir. 1968) (denoting federal

11

statutes that use the "deprivation of civil privileges as a method for regulating conduct" as "forfeiture" statutes).

The situation presented here is nothing like a conventional forfeiture. Unlike, for example, the Secretary of Veterans Affairs stripping a servicemember convicted of treason of his veteran's benefits, the Plan did not refuse to pay benefits to Foster because he had engaged in some form of prohibited action. Rather, the Plan paid Foster's benefits as contemplated under the Plan terms. Here, the Plan simply determined that it should not pay Foster's benefits twice because of Foster's failure to comply with his obligations to ensure that the initial payment was not made to an imposter. Foster's discontent with the form, manner, and recipient of the initial benefits payment might implicate the specific terms of his contract with PPG and the Plan, but it does not implicate the concept of forfeiture, as we discuss below.

### 2. ERISA's nonforfeitability provision

Section 203(a) of ERISA ("Minimum vesting standards") provides that "[e]ach pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age." 29 U.S.C. § 1053(a). It requires that an employee's own contributions to a plan are immediately nonforfeitable, and that an employer's contributions to the employee's account are nonforfeitable after a minimum vesting period. See id. § 1053(a)(1), (2). "Nonforfeitable" is statutorily defined:

> The term "nonforfeitable" when used with respect to a pension benefit or
> right means a claim obtained by a participant or his beneficiary to that part
> of an immediate or deferred benefit under a pension plan which arises from

12

the participant's service, which is unconditional, and which is legally enforceable against the plan.

29 U.S.C. § 1002(19). The pertinent regulations equate "nonforfeitable" with "vested." See 29 C.F.R. § 2530.203-1(a) ("[A] pension plan subject to [ERISA] must meet certain requirements relating to an employee's nonforfeitable ('vested') right to his or her normal retirement benefit.").

In evaluating this nonforfeitability provision, the Supreme Court has stated that the underlying purpose of these provisions was to address Congress's explicit concerns regarding the risks of plans with no vesting provisions, or plans that were underfunded, unstable, or terminated. See Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 510 n.5 (1981); Nachman Corp. v. Pension Benefits Guar. Corp., 446 U.S. 359, 374 (1980) ("One of Congress' central purposes in enacting this complex legislation was to prevent the great personal tragedy suffered by employees whose vested benefits are not paid when pension plans are terminated.") (emphasis added; internal quotation marks, footnote omitted). Consistent with this underlying purpose are the specific means undertaken by Congress "[t]o ensure that employee pension expectations are not defeated," namely, the establishment of minimum rules for participation, funding standards to increase plan solvency, fiduciary duties on the part of plan managers, and an "insurance program in case of plan termination." Alessi, 451 U.S. at 510 n.5.

3.    "Nonforfeitable" does not mean "guaranteed"

ERISA also expressly provides that certain situations in which pension benefits are reduced or eliminated do not render the rights to those benefits "forfeitable." See 29

13

U.S.C. § 1053(a)(3). These include a plan that provides that benefits shall not be payable if the participant dies; a plan that suspends pension payments if the participant is re-hired; and a plan amendment that is made applicable retroactively. See id. In light of this, the Supreme Court has observed "[i]t is therefore surely consistent with the statutory definition of 'nonforfeitable' to view it as describing the quality of the participant's right to a pension rather than a limit on the amount he may collect." Nachman, 446 U.S. at 373 (emphasis added); see Alessi, 451 U.S. at 512 (explaining that "nonforfeitable" means "that an employee's claim to the protected benefit is legally enforceable, but it does not guarantee a particular amount or a method for calculating the benefit").

By the plain language of § 1002(19), "it is the claim to the benefit, rather than the benefit itself, that must be 'unconditional' and 'legally enforceable against the plan.'" Nachman, 446 U.S. at 371. We read "unconditional" in § 1002(19) to mean that any and all conditions precedent to the participant's asserting a claim to his benefits have been met. We do not read it to mean that a participant is entitled to a fixed amount of benefits regardless of any and all later-occurring conditions, such as the theft of savings plan funds by a participant's ex-spouse in possession of a participant's Social Security number. Conditions that occur after one's rights have vested do not necessarily violate ERISA's nonforfeitability provision. See Modzelewski v. Resolution Trust Corp., 14 F.3d 1374, 1378 (9th Cir. 1994) ("[N]onforfeitable does not mean that the payments must be absolutely unconditional.") (emphasis added). Foster points us to no authority that suggests otherwise.

Foster's <u>claim</u> to his benefits was "unconditional," 29 U.S.C. § 1002(19), insofar as it was not conditioned upon any further employment or action on his part. PPG and the Plan do not dispute that Foster's interest in his Plan account was fully vested, and they did not attempt to impose any impermissible conditions on Foster's right to claim benefits. That his claim was also "legally enforceable against the plan," <u>id.</u>, is evidenced by the fact that the Plan paid out full benefits in his name in accordance with its established procedures, and by the fact that the Plan Administrator afforded Foster the opportunity for a full and fair review of his subsequent claim against the Plan. That his claim ultimately was denied does not mean that it was forfeited.

For all these reasons, we agree with the district court that the mere "fact that Foster has not received his benefits is insufficient in itself to allow him recovery against the Plan." Aplt. App. at 608 (Order at 6). The circumstances of this case entailed no forfeiture and do not violate ERISA's nonforfeitability provision. Foster was not deprived of his benefits due to the insolvency or termination of the Plan, but rather due to Ms. Foster's wrongful actions, which were facilitated by Foster's failure to maintain a current address with Defendants.

## C.   The Plan Administrator did not abuse his discretion

We find no abuse of discretion in the Plan Administrator's decision that the Plan should not reimburse Foster's Plan account for the amount Ms. Foster withdrew.

### 1.   The withdrawals from Foster's Plan account were paid to "the Participant," "in accordance with procedures established by the Administrator"

15

Foster does not deny that he received the Plan Document and the Summary Plan Description ("SPD") while he was employed by PPG. Nor does he deny that the only address to which Defendants could have sent him required Plan Newsletters was the address they had on file, and that he did not advise them of his change of address until some fourteen months after he had moved out. Under the Plan terms, as contained in the Plan Document, when Foster elected not to take his retirement funds in a lump sum distribution when he left PPG's employ, Foster was "deemed to have elected to defer receipt of his Account." Aplt. App. at 112. A participant who "elect[ed] to defer receipt of part or all of his Account balance" was allowed to make withdrawals from his account "at any time and from time to time by calling the SPSC [Savings Plan Service Center]." Id. at 113. Those withdrawals were required to be "made in accordance with procedures established by the Administrator." Id.

Under the procedures established by the Plan Administrator, and laid out in the SPD,[5] a participant could use the SPSC to access his account electronically, through the

---

[5] After oral argument, pursuant to Fed. R. App. P. 28(j), Foster drew this Court's attention to the Supreme Court's recent decision in Cigna Corp. v. Amara, 131 S. Ct. 1866 (2011), in which the Court held that summary plan descriptions do not constitute "terms" of an ERISA plan. Id. at 1878 ("[S]ummary documents, important as they are, provide communication with beneficiaries about the plan, but . . . their statements do not themselves constitute the terms of the plan . . . ."). Implicitly, Foster suggests in his Rule 28(j) letter that this language in Amara means that the PIN and address change requirements of the SPD cannot be enforced against him.

Amara does not alter our conclusion in this case. The Supreme Court was rejecting the Solicitor General's argument that because Plan terms include the terms of the SPD, a district court had power under 29 U.S.C. § 1132(a)(1)(B) to reform an ERISA plan to conform to the SPD. Instead, the Amara Court concluded that Plan terms do not include the SPD, and thus the terms of the SPD may not "necessarily . . . be enforced . . .

16

use of personal identifying information. The SPD notified participants that "[y]our [SSN] and [PIN] are your keys to access personal account information or to request transactions. Your PIN is your legal signature for all Savings Plan transactions." Id. at 176. Participants were told to keep their address current with the SPSC as a general matter, because "all Plan correspondence is mailed to your address on file at the [SPSC]," id. at 184, and specifically in the wake of a divorce. Participants were also specifically told "[b]efore requesting a new PIN, verify that your address on file is correct. PIN changes and resets are always mailed to the permanent address on file at the [SPSC]." Id. at 177. Participants were further warned "[u]sing your PIN the first time constitutes a legal signature for all future Savings Plan transactions, and it should be regarded as confidential." Id.

In other words, Foster was fully informed of how the Plan would allow him access to his money, and that someone with the correct User ID and PIN would be treated as the legal participant for purposes of processing withdrawals. Defendants followed their established procedures in making disbursements in Foster's name, including sending a new password to Foster's permanent address on file, rather than issuing it over the phone

---

as the terms of the plan itself." Amara, 131 S. Ct. at 1877 (emphasis added). Nothing in Amara suggests that where, as here, the terms of the SPD do not contradict the terms of the Plan document, the terms of the SPD will nevertheless be insufficient to "reasonably apprise [plan] participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a) (outlining purpose and requirements of summary plan descriptions). Even if the SPD did not constitute "terms" of the Plan, the procedures laid out in the SPD were explicitly referenced in the Plan Document and do not in any way contradict the Plan Document. A participant who elected to defer withdrawal was required to make those withdrawals "in accordance with procedures established by the Administrator." Aplt. App. at 113.

17

or online.  Had Foster maintained a current address with Defendants, we may assume that he, rather than Ms. Foster, would have received that new password and he would have been alerted that someone was trying to gain access to his account.

Having followed their established procedures, Defendants were entitled to rely on the legitimacy of the electronic request and to treat it as a request from Foster, as the participant.  Cf. 15 U.S.C. § 7001(a)(1) ("[W]ith respect to any transaction in or affecting interstate or foreign commerce[,] a signature . . . relating to such transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form.").  Consistent with well-established procedures for commercial transactions, they were not obligated to inquire further as to the actual identity of the requester.  Cf. U.C.C. §§ 3-103(a)(9) ("In the case of a bank that takes an instrument for processing for collection or payment by automated means, reasonable commercial standards do not require the bank to examine the instrument if the failure to examine does not violate the bank's prescribed procedures and the bank's procedures do not vary unreasonably from general banking usage . . . ."), 3-406(a) ("A person whose failure to exercise ordinary care substantially contributes to an alteration of an instrument or to the making of a forged signature on an instrument is precluded from asserting the alteration or the forgery against a person who, in good faith, pays the instrument or takes it for value or for collection.").

Defendants had no reason to suspect that anything was amiss when Ms. Foster, masquerading as Foster, obtained access to his Plan account and began requesting withdrawals.  As far as Defendants were aware, it was Foster who requested the

18

withdrawals, and it was Foster to whom those withdrawals were issued.[6] Absent any showing of fault on the part of Defendants, it was neither arbitrary nor capricious for the Plan Administrator to determine that Foster's "benefits were paid in accordance with all Plan terms and requirements," Aplt. App. at 537, and that the Plan was not liable to reimburse Foster for his loss. Cf. Gatlin v. Nat'l Healthcare Corp., 16 F. App'x 283, 288-89 (6th Cir. 2001) (unpublished) (plan administrator's decision not to issue a second check was arbitrary and capricious where plan violated its own policy by permitting unauthorized address change and then sent benefits check to wrong address, plaintiff's estranged spouse fraudulently cashed the check, and plan "refused to provide the plaintiff with any remedy for a turn of events that was entirely [the plan's] own fault").

2. **There is no ambiguity in the Plan that requires interpretation in Foster's favor**

Foster argues that the Plan is obligated to administer benefits solely for his, as opposed to its own, benefit. He argues further that an ambiguous plan should be interpreted in favor of the plan beneficiary. Implicit in this argument is the contention

---

[6] Mr. Welsh, the Plan Administrator, was deposed by Foster's counsel as follows:

Q:  But you agree that it is your position that in terms of the process by which [the funds] were distributed to [Ms. Foster], PPG procedures were followed; correct?

[Welsh's counsel objected to form.]

A:  Yes.

Q.  It wasn't an employee of PPG that made a mistake and gave the money to the wrong person.

A.  True.

[Welsh's counsel objected to form.]

Aplt. App. at 398-99.

that where the Plan is silent on risk of loss from identity theft, the Plan is ambiguous, and therefore the Plan, as fiduciary, bears the risk of loss. Foster's reliance on the Plan Administrator's fiduciary obligation to administer the plan and interpret its ambiguities in his favor is misplaced.

This Court has held that "'federal common law, governed by principles of trust law,'" governs the interpretation of an ERISA plan. Miller v. Monumental Life Ins. Co., 502 F.3d 1245, 1249 (10th Cir. 2007) (quoting Blair v. Metro Life Ins. Co., 974 F.2d 1219, 1222 (10th Cir. 1992), in parenthetical). In interpreting an ERISA plan, "we examine the plan documents as a whole and, if unambiguous, construe them as a matter of law." Id. at 1250 (internal quotation marks, alterations omitted). Whether an ERISA plan term is ambiguous depends on the "common and ordinary meaning as a reasonable person in the position of the plan participant would have understood the words to mean." Id. at 1249 (internal quotation marks, alterations omitted).

This interpretive standard is consistent with the central purposes of ERISA: "to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits." Bruch, 489 U.S. at 113 (internal quotation marks and citations omitted). It is also consistent with the language of ERISA, which mandates that the summary plan description shall be "written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations." 29 U.S.C. § 1022(a). Similarly, ERISA mandates that summaries of material modifications in the terms of the plan (such as the Newsletters supplied in this

20

case) "shall be written in a manner calculated to be understood by the average plan participant." Id.

Applying this standard here, we conclude that the Plan is not ambiguous based on its silence on the question of reimbursing a participant for the fraudulent withdrawal of plan monies where (1) the Plan specifically references "procedures established by the Administrator," Aplt. App. at 113; (2) those procedures contain a basic requirement of maintaining a current address; and (3) the Plan processed the withdrawals in accordance with those procedures. Accordingly, there is no need to resort to the general trust principle that a fiduciary must interpret ambiguities in favor of the beneficiary. The common and ordinary meaning of the relevant Plan terms in the Plan Document provided that a participant who deferred receipt of his benefits had to request withdrawals in accordance with the "procedures established by the Administrator." Id. at 113. The Administrator's procedures, laid out in the SPD and Plan Newsletters, unambiguously provided for a system of online access to Plan accounts, in which PINs, created and protected by the safeguards detailed above, would constitute legal signatures authorizing transactions. A reasonable person in Foster's position would have understood that under these procedures, it was his responsibility to keep his address current and to safeguard information that might be used to gain access to his account. He would further have understood that the reason for these safeguards was precisely because the Plan would treat a person in possession of a participant's personal identifying information as the participant.

21

That the Plan did not explicitly spell out that the Plan would not be liable for losses incurred as a result of a participant's failure to comply with Plan security measures does not create an ambiguity that must be resolved in Foster's favor. See Harris v. Harvard Pilgrim Health Care, Inc., 208 F.3d 274, 278 (1st Cir. 2000) ("[U]nqualified [ERISA] plan provisions need not explicitly rule out every possible contingency in order to be deemed unambiguous."); Sunbeam-Oster Co., Inc. Grp. Benefits Plan for Salaried and Non-Bargaining Hourly Emps. v. Whitehurst, 102 F.3d 1368, 1376 (5th Cir. 1996) ("That judges and lawyers, who by education and experience are primed to discover ambiguity in contract language, might find gaps or contradictions in a summary plan description's ordinary, conversational language does not mean that the language is necessarily ambiguous or silent to the point of default for ERISA purposes."). ERISA mandates that Plan information be written in terms comprehensible to the average participant. 29 U.S.C. § 1022(a). It need not be exhaustive; it need only be "sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations." Id. (emphasis added); see Kress v. Food Emp'rs Labor Relations Ass'n, 391 F.3d 563, 568 (4th Cir. 2004) ("We will not create a Catch-22, under which a plan is either hopelessly complicated and legalistic—in violation of § 1022(a)—or 'ambiguous' and subject to unwarranted judicial scrutiny."). The Plan information here was sufficient to "reasonably apprise" Foster of his rights and obligations.

We also note that the Plan Administrator's decision was consistent with its fiduciary obligation to safeguard Plan assets for the benefit of all participants, not just

Foster. The Plan had paid out benefits in full in Foster's name once; to do so again would have depleted Plan assets to the detriment of other participants. See Varity Corp. v. Howe, 516 U.S. 489, 514 (1996) ("[A] fiduciary obligation, enforceable by beneficiaries seeking relief for themselves, does not necessarily favor payment over nonpayment. The common law of trusts recognizes the need to preserve assets to satisfy future, as well as present, claims and requires a trustee to take impartial account of the interests of all beneficiaries."); Phelan v. Wyo. Associated Builders, 574 F.3d. 1250, 1258 (10th Cir. 2009).

## III. CONCLUSION

We conclude that Foster's claim to his Plan benefits was not forfeited in violation of ERISA. Weighing all factors together, we conclude further that the Plan Administrator did not abuse his discretion in deciding that the Plan should not reimburse Foster's Plan account for the amount Ms. Foster withdrew. Accordingly, we AFFIRM the order of the district court.