**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 13, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

KEVIN MCMILLAN,

      Plaintiff - Appellee,

v.

AT&T UMBRELLA BENEFIT PLAN
NO. 1,

      Defendant - Appellant.

No. 17-5111
(D.C. No. 4:14-CV-00717-GKF-PJC)
(N.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BACHARACH**, **PHILLIPS**, and **McHUGH**, Circuit Judges.
_____

    AT&T Umbrella Benefit Plan No. 1 (the "Plan"), appeals from the district

court's order that reversed the Plan administrator's denial of short-term disability

("STD") benefits to Kevin McMillan and awarded him benefits for twenty-six

weeks—the maximum period allowed under the Plan. The Plan also appeals the

court's later order that denied, in part, the Plan's motion to alter or amend the

judgment. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm both orders.

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
submitted without oral argument. This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel. It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

## I. STD BENEFITS

### A. *The Plan*

McMillan went to work for AT&T Corporation in 2007. As an eligible employee, McMillan received STD insurance under the company's income benefit program, which was a component of the Plan. Sedgwick Claims Management Services, Inc. ("Sedgwick") was the third-party claims administrator. Under the terms of the Plan, an insured was considered totally disabled "when, because of Illness or Injury, [he was] unable to perform *all* of the essential functions of [his] job." Aplt. App., Vol. II at 47 (emphasis added). With respect to proof, the Plan did not require objective evidence of disability; instead, it provided that the administrator could rely on information that "include[d], but [was] not limited to, medical, psychiatric or psychological opinion from the treating or reviewing Physician that [was] supported by diagnostic tools and examinations, which [were] performed in accordance with the generally accepted principals [sic] of the health care profession." *Id*. at 71. The administrator had the authority to require McMillan to "[r]eport for a medical examination by a Physician designated by" Sedgwick to determine whether he was disabled. *Id*. at 47.

### B. *McMillan's Claim for STD Benefits*

The arbitrary and capricious standard of review requires us to set forth in detail the facts of the proceedings below. McMillan was working as a Senior IT Client Consultant when he initiated his claim on April 25, 2013. He estimated that his first day of absence would be June 1, 2013, but later revised that date to May 14,

2013. In his claim, McMillan complained of sleep apnea, diabetes, stage III kidney disease, shortness of breath, chronic obstructive pulmonary disease, inability to walk or stand for long periods of time, and an inability to focus, concentrate, and retain short-term memory.

Sedgwick acknowledged the claim and requested detailed medical information to substantiate the alleged disability. In late May 2013, Sedgwick obtained McMillan's medical records and a general description of the physical requirements of his job, which it noted as "[s]edentary; sitting, talking, typing." *Id*. at 115.

McMillan's physician, Dr. Terence Grewe, submitted an initial statement that listed McMillan's diagnoses as coronary disease, type-two diabetes, hypertension, and sleep apnea, and his functional restrictions as excessive fatigue and sleep problems. The list that accompanied Dr. Grewe's statement identified several issues that affected McMillan's job performance, including extreme daytime fatigue, lack of concentration, poor memory, inability to multitask, difficulty with complex problem-solving, shortness of breath, and inconsistent sleep.

Sedgwick's claim representatives reviewed Dr. Grewe's information and concluded that the clinical findings were insufficient to approve benefits. As such, they recommended that the case be sent to a Physician Advisor ("PA") to determine whether McMillan could perform his job duties. The case was referred to Network Medical Review Co., Ltd. ("NMR"), which in turn assigned Dr. David Hinkamp to identify any objective findings that prevented McMillan from performing what it described as his "sedentary" job duties. *Id*. at 124. Dr. Hinkamp concluded "[t]here

3

are insufficient objective medical findings to support an inability to perform *sedentary* job duties." *Id.* at 124-25 (emphasis added). Sedgwick reviewed and approved Dr. Hinkamp's conclusions and formally advised McMillan that his claim was denied.

McMillan filed an administrative appeal. In his appeal letter to Sedgwick, McMillan reasserted that he was "unable to perform all of the essential functions of his job . . . due to severe sleep apnea and resultant cognitive dysfunction." *Id.*, Vol. III at 264. As an overarching matter, McMillan complained that "Sedgwick did not obtain a formal job description from AT&T as to [my] pre-disability occupation. This begs the question how Sedgwick was able to determine [I] was able to perform a job that it knew nothing about?" *Id.* at 265.

The appeal letter also included numerous additional medical records that included a neuropsychological assessment by Dr. Sharna Wood, which detailed her interview of McMillan and explained the results of several tests.[1] Dr. Wood summarized her findings and opinions as follows:

> Examination of Kevin's performance on the various measures reveals that at the time of this evaluation he was functioning in the superior range in academic and intellectual testing, but in the average range on tests of memory, visuospatial analysis and executive functioning; in the below average range in attentional processing and in the mildly impaired range in language functioning. This pattern of test scores is indicative of disruptions in his cognitive ability.

---

[1] Dr. Wood administered the following tests to McMillan: (1) "Wide Range Achievement Test 4"; (2) "Neuropsychological Assessment Battery"; (3) "Validity Indicator Profile"; (4) "Modified Functional Assessment Questionnaire"; (5) "Personality Assessment Inventory"; (6) "Reynolds Intellectual Assessment Scales"; and (7) "Test of Memory Malingering." Aplt. App., Vol. III at 516.

*Id.* at 529. Dr. Wood attributed McMillan's cognitive dysfunction to oxygen deprivation caused by sleep apnea and obstructive pulmonary hyperextension.

McMillan's appeal documents also included additional medical records from Dr. Grewe. In an April 2013 patient visit note, McMillan reported "increased [shortness of breath] with minimal exer[t]ion [and] [d]yspnea while walking inside, [and] on level ground." *Id.* at 423. McMillan returned to Dr. Grewe a week later for a "recheck on breathing." *Id.* at 427. Because McMillan reported no improvement, Dr. Grewe referred him to two pulmonologists. McMillan saw Dr. Grewe again in June, and he again reported continued shortness of breath while walking, overall weakness, and daytime somnolence. In addition to testing that demonstrated a relatively high likelihood of falling asleep during the day, Dr. Grewe also concluded that "[e]ven if [McMillan] could physically go back to work, [he] cannot focus enough to adequately perform work tasks." *Id.* at 437.

In response to McMillan's appeal, Sedgwick contacted McMillan's former supervisor to obtain a complete job description. The supervisor explained that although there were "[n]o physical requirements other than associated travel on occasion (if any)[,] [i]t is a cognitive position as it requires memory and thought about software installation, setup and client interaction." *Id.* at 310. When asked for further information about the travel demands, the supervisor added:

> Travel was random based on the . . . work sold. Generally it was project work . . . out of state which would require air travel. . . . Generally our consultants travel around 20% of the time, but could increase to 100% based on the project need and statement of work. And in some cases a year

5

would go by where no travel was needed. When not travelling [McMillan] worked from home.

*Id*. at 309.

Sedgwick then referred McMillan's appeal to PAs with specialties in internal medicine, endocrinology, pulmonology, and neurology. Each PA was asked to address, among other things, whether McMillan was disabled from his job from May 21, 2013, through August 25, 2013, as well as how the clinical findings in his medical records could impact his ability to function. The referral form directed the PAs to see the "detailed job duty description included in the file." *Id*. at 313.

The four PA specialists reviewed the claim file and submitted reports to Sedgwick. Each PA found McMillan was not disabled from his job for the period in question, but none of the reports contained any specific discussion of McMillan's job duties, including cognitive and travel requirements. Next, Sedgwick sent the reports to Dr. Steven Channick, an internal medicine specialist, for a cumulative review. Dr. Channick concluded that McMillan was not disabled from an internal medicine perspective. But like the other PA reports, Dr. Channick's report contained no specific discussion of McMillan's job duties, and also failed to address the cognitive or travel requirements.

In response to the five PA reviews, McMillan submitted, among other things, a rebuttal letter from Dr. Wood and records from McMillan's cardiologist, Dr. John Roye. Dr. Roye wrote on March 28, 2014, that a recent heart catheterization procedure "revealed [McMillan] had small vessel coronary disease that [was] not

6

amenable to intervention or grafting." *Id*., Vol. VIII at 1384. As such, Dr. Roye opined that McMillan was "totally and permanently disabled because of inoperable coronary artery disease." *Id*. And Dr. Wood opined that due to McMillan's chronic hypoxia, "it was clear that he is experiencing some cognitive dysfunction that is impairing his ability to work—particularly at such a cognitively demanding position as his last." *Id*. at 1362. According to Dr. Wood, "[t]he scientific literature dating back to the early 1970's overwhelmingly supports the notion that the chronic hypoxia caused by sleep apnea causes cognitive dysfunction, particularly in the domains of memory, attention, and executive functioning, such as Mr. McMillan exhibited in his testing with me." *Id.* at 1362.

Sedgwick sent McMillan's additional materials to NMR and requested addendum reports from the five PAs. In their addendums, each PA reaffirmed his or her original conclusions that McMillan was not disabled. Once again, however, there was no specific discussion of McMillan's job duties in any of the reports. In fact, the internal medicine PA who replaced Dr. Channick, opined that McMillan was not disabled without having *any* information about McMillan's job duties: "The patient's job description was not made available for this reviewer." *Id*. at 1392.

Nonetheless, Sedgwick informed McMillan that his claim was denied. McMillan then sued for judicial review of the decision under the Employee Retirement Income Security Act ("ERISA"). The district court found that the Plan's denial of McMillan's claim was arbitrary and capricious because Sedgwick failed to adequately consider McMillan's ability to perform *all* of his essential job functions

7

before denying his claim. The court also found that McMillan's travel duties were inconsistent with the description of his job duties as sedentary. *See McMillan v. AT&T Umbrella Benefit Plan No. 1*, 161 F. Supp. 3d 1069, 1079-80 (N.D. Okla. 2016). But rather than award benefits, the district court remanded McMillan's claim back to the Plan for further processing. *See id*. at 1080-81.

## C. The Proceedings on Remand

On remand, Sedgwick asked NMR to obtain new PA reviews, including cumulative reviews and a panel review. Specifically, Sedgwick asked the PAs to opine, among other things, on whether McMillan could perform his regular job, which "includes travel and the ability to perform with high level cognitive functioning," and whether, "from a cumulative perspective, [McMillan was] disabled from his regular job." Aplt. App., Vol. X at 1599. Sedgwick ignored NMR's express concern that the request for cumulative reviews was beyond the expertise of the individual PAs, and required that each PA should "answer all of the questions that were provided, *including the cumulative question*." *Id*. at 1600 (emphasis added).

Dr. Robert Cooper conducted an endocrinology, diabetes and metabolism review in which he fully identified McMillan's job duties and concluded that he was not disabled from a cumulative perspective. Dr. Taj Jiva conducted a pulmonary review and also concluded that McMillan was not disabled on a cumulative basis; however, Dr. Jiva did not fully identify McMillan's job duties and incorrectly referred to the job as "sedentary." *Id*. at 1693. Dr. Andrew Lawton performed an ophthalmology review in which he fully identified McMillan's job duties and concluded that he was not cumulatively disabled.

8

Dr. Beverly Yamour's internal medicine/cardiovascular review fully identified McMillan's job duties. Although Dr. Yamour acknowledged Dr. Rowe's March 2014 report that McMillan had severe and inoperable coronary disease, she found that he was not disabled from a cumulative perspective. Dennis Buchholz, Ph.D., conducted a neuropsychological review. He also failed to fully describe McMillan's job duties, but nonetheless concluded that McMillan was not disabled because there *was no testing* to support any cognitive impairments.

Sedgwick considered the new PA reviews and informed McMillan that the claim was denied. McMillan filed an administrative appeal that was supported by additional information and medical records. As a general matter, he argued that: (1) the reviewers ignored pertinent medical history, including Dr. Grewe's report about shortness of breath; (2) cognitive assessments based solely on a review of records, such as the review conducted by Dr. Buchholz, are fundamentally unreliable; and (3) the reviewers offered cumulative medical opinions beyond their areas of training and expertise.

Specific to his cognitive impairments, McMillan submitted a new rebuttal report from Dr. Wood and job performance reviews from 2012 that demonstrated a cognitive decline. Further, McMillan submitted records from the Social Security Administration ("SSA"), in which the agency determined that he was disabled effective May 2013. The SSA based its disability determination, in part, on a report of Brian R. Snider, Ph.D., who was retained by the agency to perform a consultative neurological examination. In December 2014, Dr. Snider met face-to-face with McMillan and administered a mental status examination. Based on the testing and examination, Dr. Snider found that

9

McMillan "would likely have marked difficulty with complex and detailed instructions" and "moderate [to] marked difficulty concentrating and persisting through a normal work day due to memory problems." *Id.* at 1798. The SSA, in turn, found moderate limitations in McMillan's ability to (1) "understand and remember detailed instructions"; (2) "carry out detailed instructions"; (3) "maintain attention and concentration for extended periods"; and (4) "interact appropriately with the general public." *Id.* at 1810-11.

With regard to shortness of breath, McMillan submitted a letter from Dr. Roye that stated he "was symptomatic with dyspnea on exertion and should be considered disabled as of 4/22/2013." *Id.* at 1749.

In response to McMillan's appeal, Sedgwick requested five new PA reviews. This time, Sedgwick classified McMillan's job as "light," and again directed the reviewers to (1) "comment on [his] ability to perform his job requirements, that includes travel and the ability to perform with high level cognitive functioning" and (2) provide cumulative assessments of disability. *Id.*, Vol. XI at 1830.

Dr. A. Wayne Meikle conducted an endocrinology, diabetes and metabolism review. He identified McMillan's job duties as "sitting, typing, talking, walking, computer, and desk work." *Id.* at 1833. Dr. Meikle noted the lack of any "objective medical information in the medical records to support the employee's inability to perform his job duties," *id.* at 1835, and concluded that McMillan was not disabled on a cumulative basis. Dr. Meikle, however, failed to reconcile or explain the

10

relationship between his description of McMillan's job duties and whether he could meet the travel demands.

The PA who provided the sleep medicine and pulmonary review, Dr. Heidi Connolly, incorrectly classified McMillan's job duties as "sedentary," and described them as "sitting, talking, and some walking." *Id.* at 1838. She opined that McMillan could perform the requirements of his job, "including travel and high level cognitive function," *id.* at 1839, and therefore, he was not disabled from a sleep medicine /pulmonary perspective. But Dr. Connolly did not explain the basis for her opinion in light of the travel demands.

Robert L. Collins, Ph.D., conducted the neuropsychological review. He also erroneously described McMillan's job as "sedentary," which involved "sitting, talking, and some walking." *Id.* at 1844. Dr. Collins did note that the cognitive demands of McMillan's job required "intense concentration, focus, attention to detail, and the ability to handle multiple tasks concurrently." *Id.* Nonetheless, Dr. Collins offered a bare bones conclusion that McMillan could perform the travel and cognitive duties of his job: "From a neuropsychology perspective the provided medical records would not support the employee being unable to perform his job requirements which include travel and the ability to perform with high cognitive functioning." *Id.* at 1851.

Dr. Collins further said it was "inaccurate" for Dr. Wood to "us[e] a metric of 'superior functioning' by which to judge the normality of all other cognitive domains." *Id.* But Dr. Collins did not say what metric Dr. Wood should have used,

11

or what the results would have been had she used a different metric. Dr. Collins also explained "that it is not unusual for patients completing a large battery of tests to have variability within their performance—and that neurologically healthy adults are likely to have one to two scores in the mildly impaired range." *Id*. What is significant, however, is what Dr. Collins *did not say.* Dr. Collins did not say that Dr. Wood should have used a different diagnostic tool or that the tools she used were something other than the tools commonly used by neuropsychologists to evaluate cognitive domains. Nor did he say that the tests were improperly performed. And although Dr. Collins acknowledged Dr. Snider's mental status examination, he did not question his findings and conclusions.

The cardiovascular review was performed by Dr. Patrick S. Weston. He also incorrectly classified McMillan's job duties as "sedentary," which involved "sitting, talking, and some walking." *Id*. at 1867. Dr. Weston opined in a conclusory manner that McMillan could meet the travel and cognitive demands of the job, but did not explain how this was so in light of his serious heart problems. Nor did he contact Dr. Roye, who performed the heart catheterization procedure on McMillan in early 2014, which "revealed [McMillan] had small vessel coronary disease that [was] not amenable to intervention or grafting," and he was therefore "totally and permanently disabled because of inoperable coronary artery disease." *Id*., Vol. VIII at 1384. He also failed to address Dr. Roye's letter that stated McMillan "was symptomatic with dyspnea on exertion and should be considered disabled as of 4/22/2013." *Id*., Vol. X at 1749.

12

The cumulative or "whole body" review was conducted by Dr. Stephen H. Broomes. Dr. Broomes did not specifically address the job description provided by Sedgwick, and he characterized McMillan's duties as "sitting, typing, talking, walking, computer, and desk work." *Id.*, Vol. XI at 1857. But Dr. Broomes did note that McMillan's "job require[d] intense concentration, focus, attention to detail, and the ability to handle multiple tasks concurrently." *Id.* Nonetheless, Dr. Broomes failed to explain or discuss his conclusion that McMillan could perform *all* of the requirements of his job—including its travel and cognitive requirements.

McMillan reviewed the new PA reports and filed an appeal letter. In response, Sedgwick requested addendum opinions from the PAs to address McMillan's comments. Three of the PA opinions merit discussion. For the first time, the neuropsychologist Dr. Collins commented on Dr. Snider's assessment, including the mental status examination. Dr. Collins stated that Dr. Snider's work "should only be viewed as a screening assessment which has inherent limitations [because the] evaluation occur[ed] in a medico-legal context," and there were no "adequate measures of performance validity." *Id.* at 1895. As such, Dr. Collins opined that "the data collected should only be viewed as lower bound estimates." *Id.* Importantly, however, Dr. Collins did not reject Dr. Snider's mental status examination findings *as wrong*—only that they should be regarded as a lower bound estimate.

Dr. Weston, who previously opined that there was insufficient clinical evidence to support a finding of disability, acknowledged Dr. Roye's findings of

13

cardiovascular abnormalities, but argued that they "would not be expected to support the diagnosis of disability." *Id.* at 1902. In particular, Dr. Weston maintained that the abnormalities would not "be expected to explain increasing shortness of breath with minimal exertion and while walking." *Id.* Although Dr. Weston admitted that "[s]ymptoms of dyspnea on exertion is a subjective finding," *id.*, he ignored Dr. Roye's findings without ever having examined McMillan.

For his part, Dr. Broomes reaffirmed his previous opinion that the objective evidence did not support a finding of disability, but he again failed to describe the entire panoply of McMillan's job duties. Shortly thereafter, Sedgwick circled back to Dr. Broomes for an addendum as the "consensus reviewer," *id.* at 2074, and provided Dr. Broomes with a copy of the supervisor's description of McMillan's job duties. It then posed the following question: "The employee's job duties include travel and the ability to perform with a high level of cognitive functioning. Please confirm that the attached job duties have been reviewed. Does this information impact your original opinion?" *Id.* Dr. Broomes conducted a review with the other panel members and responded with the panel's consensus opinion:

> We collectively felt that the patient did not have objective findings, physically or cognitively, that would result in limitations or restrictions from a cumulative perspective. We did all agree that the gentleman had significant medical issues that required ongoing medical care, but none that would preclude him from performing a desk job and none that we could identify that would preclude him from traveling at 20% or performing with a high level of cognitive functioning.

*Id.* at 2080-81.

14

Sedgwick recognized that Dr. Broomes's description of McMillan's job duties was once again incomplete, and requested yet another addendum to address whether a "100%" travel requirement would change his opinion. *Id.* at 2088. Dr. Broomes responded a few days later and advised Sedgwick that the "information does not change the previous cumulative whole body consensus." *Id.* at 2094. There is no record evidence that Dr. Broomes contacted any other panel member prior to issuing the addendum that purported to represent the panel's opinion.

Sedgwick reaffirmed its denial of STD benefits. In doing so, it expressly relied on the opinions of the most recent review panel—Drs. Meikle, Connolly, Collins, Weston, and Broomes.

McMillan moved for judicial review of the district court's post-remand denial of his claim for STD benefits. The court concluded that the denial was arbitrary and capricious and awarded McMillan twenty-six weeks of benefits. The court also denied the Plan's motion to alter or amend the judgment. This appeal followed.

## D. Analysis

### 1. Standard of Review

"This Court reviews the plan administrator's decision to deny benefits to a claimant, as opposed to reviewing the district court's ruling." *Foster v. PPG Indus., Inc.*, 693 F.3d 1226, 1231 (10th Cir. 2012) (internal quotation marks omitted). "We will review a denial of plan benefits under a *de novo* standard unless the plan provides to the contrary." *Id.* (internal quotation marks omitted). Here, because Sedgwick has full discretionary authority to interpret and construe the terms of the

15

Plan, we review its decision to deny benefits under the arbitrary and capricious standard. *See id.* "Under arbitrary and capricious review, this court upholds [the administrator's] determination so long as it was made on a reasoned basis and supported by substantial evidence." *Van Steen v. Life Ins. Co. of N. Am.*, 878 F.3d 994, 997 (10th Cir. 2018).

But the arbitrary and capricious standard of review is not without meaning.[2] This is because ERISA imposes "a special standard of care upon a plan administrator, namely, that the administrator 'discharge [its] duties' in respect to discretionary claims processing 'solely in the interests of the participants and beneficiaries' of the plan, [29 U.S.C.] § 1104(a)(1)." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008). Consistent with this special standard of care, plan administrators must "provide a 'full and fair review' of claim denials." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989) (quoting 29 U.S.C. § 1133(2)). And to ensure that plan administrators meet their fiduciary obligations, Congress has provided for "judicial review of individual claim denials." *Metro Life*, 554 U.S. at 115 (citing 29 U.S.C. § 1132(a)(1)(B)).

"We look for substantial evidence in the record to support the administrator's conclusion, meaning more than a scintilla of evidence that a reasonable mind could accept as sufficient to support a conclusion." *Eugene S. v. Horizon Blue Cross Blue*

---

[2] In the context of our review of a plan administrator's denial of an ERISA claim "[t]his Court treats the abuse-of-discretion standard and the arbitrary-and-capricious standard as interchangeable." *Foster v. PPG Indus., Inc.*, 693 F.3d 1226, 1231 (10th Cir. 2012) (internal quotation marks omitted).

16

*Shield of N.J.*, 663 F.3d 1124, 1134 (10th Cir. 2011) (internal quotation marks omitted). "Substantiality of the evidence is based upon the record as a whole. In determining whether the evidence in support of the administrator's decision is substantial, we must take into account whatever in the record fairly detracts from its weight." *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002) (alteration and internal quotation marks omitted).

### 2. Travel Requirements

The record does not contain substantial evidence that McMillan could perform the travel duties of his job. We acknowledge that the PA reviewers stated that they considered the travel requirements and concluded that McMillan could perform them. But there is no discussion in any of the reviews of what travel entails and how McMillan could meet those demands in light of his serious medical impairments, particularly shortness of breath.

On appeal, the Plan argues that a reviewing court goes "beyond the bounds of an arbitrary and capricious review," when it "demand[s] additional detailed analysis." Aplt. Opening Br. at 21. This is true as a general statement of the law, but misses the point. The problem is the lack of *any* analysis, let alone a reasoned analysis. For example, the reviews by Drs. Meikle, Connolly, Collins, Weston, and Broomes contain nothing more than conclusory statements that McMillan could travel without any discussion whatsoever. This causes us to question that the Plan afforded McMillan the "fair review" the Supreme Court called for when it explained the

17

fiduciary duties owed by a plan administrator to a claimant. *See Metro Life*, 554 U.S. at 115.

It is also significant that Dr. Broomes had to rewrite his review on several occasions. Equally important is the fact that Dr. Broomes's serial reviews were not based on new evidence; instead they were a product of Sedgwick's narrowly tailored leading questions.

We also reject the Plan's argument that McMillan's "travel duties involved [nothing] more than walking or sitting or that they involved the type of physical exertion that would take his job duties out of the 'sedentary' classification." Aplt. Reply Br. at 2. Setting aside the fact that the district court found that McMillan's job description was inconsistent with sedentary work, *see* Aplt. App., Vol 12 at 2206, "travel" is not a sedentary activity and involves more than sitting. Admittedly, "travel" does not require running or aerobic exercise, but it plainly involves more physical exertion than what is required to work from home, which is what McMillan did when he was not travelling. The Plan further argues that to navigate his way through an airport, McMillan "could have carts take him between terminals and to gates and hire skycaps to carry his bags." Aplt. Reply Br. at 2. But this argument fails to address all of the other demands of travel. More to the point, this type of analysis should have been provided by the PA reviewers—not the Plan's lawyers on appeal.

In the context of travel demands, it is also important to recognize Dr. Grewe's patient notes from April through June, 2013, which documented McMillan's reported

shortness of breath, as well as Dr. Roye's opinion that McMillan "was symptomatic with dyspnea on exertion and should be considered disabled as of 4/22/2013." Aplt. App., Vol. X at 1749. In his addendum review, Dr. Weston acknowledged Dr. Roye's opinion, but chose to rely exclusively on the results of an echocardiogram and ignore McMillan's repeated complaints of shortness of breath on minimal exertion, such as walking indoors.[3] While Dr. Weston noted McMillan's reports about shortness of breath, he apparently chose to ignore them because they were based on subjective complaints. But the Plan does not require objective evidence to establish a disability. As such, we conclude that Dr. Weston failed to consider relevant evidence in his opinion that McMillan was not disabled.

The Plan's determination that McMillan could perform the travel duties of his job was not supported by substantial evidence, and was therefore arbitrary and capricious.

### 3. Cognitive Requirements

Likewise, the Plan's determination that McMillan could perform the cognitive requirements of his job is not supported by substantial evidence. Instead, this determination hangs by the gossamer thread of Dr. Collins's reviews.

Unlike Social Security disability proceedings, "[n]othing in [ERISA] . . . suggests that plan administrators must accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord.*, 538 U.S. 822, 831

---

[3] In his initial review, Dr. Weston noted, but did not discuss, McMillan's reports to Dr. Grewe about shortness of breath.

19

(2003). Still, "[p]lan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id*. at 834. To be sure, Dr. Snider's examination and the SSA's disability determination do not require the conclusion that Sedgwick's denial of benefits was arbitrary and capricious. But Dr. Snider's examination is acceptable evidence under the Plan. Similarly, although the Plan is not bound by Dr. Wood's opinion, it is also reliable evidence.

Dr. Collins never said that Dr. Snider's mental status examination was wrong—only that it represented "lower bound estimates" of cognitive functioning. Aplt. App., Vol. XI at 1895. And although Dr. Collins took exception to Dr. Wood's interpretation of the tests administered to McMillan, he did not explain what she should have done differently or how the results would have changed.

We have carefully examined the record and conclude that the Plan's determination that McMillan could perform the cognitive requirements of his job is arbitrary and capricious because it is based on a "scintilla of evidence that [no] reasonable mind could accept as sufficient to support [the] conclusion." *See Eugene S.*, 663 F.3d at 1134 (internal quotation marks omitted).

## II. MOTION TO ALTER OR AMEND

### A. *The Motion and District Court's Order*

On August 14, 2017, the district court entered judgment in favor of McMillan and awarded him benefits from June 12, 2013 through the date of judgment. The court's intent "was to grant McMillan twenty-six weeks of short-term disability

20

benefits, which is the maximum number of weeks for which benefits are payable under the plan." Aplt. App., Vol. XII at 2254.

The Plan subsequently filed a motion to alter or amend the judgment under Fed. R. Civ. P. 59(e), to provide benefits for a thirteen-week period between May 21, 2013 and August 25, 2013—the time between the effective denial of McMillan's claim and when McMillan allegedly returned to work. The district court agreed that the correct start date for the commencement of benefits was May 21, 2013—the date McMillan's claim was effectively denied. The court, however, disagreed that McMillan's benefits should have ended on August 25, 2013.[4]

First, the court found that "the record is ambiguous as to whether McMillan returned to work on August 26, 2013." *Id*. at 2256. When Sedgwick administratively denied McMillan's claim on June 12, 2013, McMillan had two options: (1) return to work or (2) appeal the denial. The court found that the record failed to establish that McMillan returned to work. On August 22, 2013, McMillan's supervisor called Sedgwick to learn whether McMillan had appealed. On August 26, 2013, Sedgwick sent McMillan's supervisor a notice that McMillan would "[r]eturn [] to work full time full duty [on] 08/26/2013." *Id*., Vol. II at 238. Sedgwick was informed later that day that McMillan intended to appeal.

---

[4] The Plan argues for the first time on appeal that benefits should have ceased no later than September 13, 2013, when McMillan's employment was terminated. We will not consider this argument, however, because the Plan did not raise it in the district court. *See Dahl v. Dahl*, 744 F.3d 623, 629 (10th Cir. 2014) "[W]e will not consider [an] argument . . . not ma[d]e . . . in district court.").

21

On May 5, 2014, Sedgwick notified McMillan that his appeal was denied. A few days later, McMillan called Sedgwick and requested to initiate a claim for long-term disability benefits ("LTD"). The administrator informed him that STD claims are "transitioned" to LTD claims, and his only choice was to file suit. *Id*. at 159.

Based on this record, the district court found that the Plan failed to "identify in the record any employment records or correspondence to or from McMillan showing that he actually did return to work on August 26, 2013." *Id*., Vol. XII at 2256.

Second, the district court concluded that the award of benefits was not "limited to the time period for which Sedgwick denied McMillan benefits—from May 21, 2013 to August 25, 2013." *Id.* at 2257. The court distinguished a line of cases cited by the Plan as inapplicable because "they stand for the commonsense proposition that where a plaintiff fails to file a claim for long-term disability benefits, the court's review is limited to the administrator's decision regarding short-term disability benefits." *Id*. But the court found that McMillan's "situation here is different: McMillan actually did file a claim for short-term disability benefits, and Sedgwick did render a final decision on it." *Id*. The court found no clear error in its award of twenty-six weeks of benefits, and entered an amended judgment for benefits from May 21, 2013 through November 19, 2013.

**B. *Analysis***

"We review the denial of a Rule 59(e) motion to alter or amend a judgment for abuse of discretion." *Monge v. RG Petro-Mach. (Grp.) Co.*, 701 F.3d 598, 610

(10th Cir. 2012). "A district court abuses its discretion if it made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Id*. at 610-11 (internal quotation marks omitted). The only grounds for granting a Rule 59(e) motion are "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." *Id*. at 611 (internal quotation marks omitted).

The Plan never discusses the standard of review. More to the point, it does not argue an intervening change in the law or cite new evidence that was previously unavailable. Nor does it explain any clear error. Instead, the Plan restates the facts and argues for a different outcome. This is not enough to establish that the district court abused its discretion when it denied the Plan's request to reverse its award of twenty-six weeks of benefits.

## III.  CONCLUSION

For the foregoing reasons, we affirm the district court's order that reversed the Plan administrator's denial of STD benefits. We also affirm the court's order that denied the Plan's motion to alter or amend the judgment to reduce the award of twenty-six weeks of benefits.

Entered for the Court


Gregory A. Phillips
Circuit Judge

23