Rick V. **CALDWELL** and Sonya S. Caldwell, Plaintiffs,

v.

**UNUM LIFE INSURANCE COMPANY OF AMERICA, Defendant.**

**Case No. 2:16–CV–0236–SWS**

United States District Court, D. Wyoming.

Signed 09/21/2017

1254

Karen E. Hinkle, Richard A Mincer, Traci L. Lacock, Hirst Applegate LLP, Cheyenne, WY, for Plaintiffs. Byrne J. Decker, Pierce Atwood LLP, Portland, ME, Erica Rachel Day, Williams Porter Day & Neville PC, Casper, WY, Ronald M. LaRocca, Pierce Atwood LLP, Providence, RI, for Defendant.

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

Scott W. Skavdahl, United States District Judge

This matter comes before the Court on *Unum's Motion for Summary Judgment*

*or in the Alternative Motion for Judgment on the Record* (ECF No. 54) and *Plaintiffs' Motion for Summary Judgment* (ECF No. 56). This case arises out of Plaintiffs' claim for accidental death benefits under a policy of group insurance Defendant Unum Life Insurance Company ("Unum") issued to Sinclair Services Company, the employer of Plaintiffs' late son, William Caldwell. Unum based its denial of benefits on a determination that speeding is a crime for purposes of a policy exclusion for a loss "caused by, contributed to by, or resulting from ... an attempt to commit or commission of a crime." Plaintiffs filed this ERISA action seeking review of Unum's determination. The Court, having reviewed the record and considered the parties' respective motions and opposition briefs, having heard oral argument of counsel and being otherwise fully advised, FINDS and ORDERS that Defendant Unum's motion should be granted and Plaintiff's motion denied.

### BACKGROUND

On June 28, 2015, Plaintiffs' son, William Caldwell, was traveling approximately 74 mph on a dirt roadway in Carbon County, Wyoming where the posted speed limit is 35 mph but the "legal speed limit is 55 mph." (WHP Investigator's Traffic Crash Report, R. at 103; Amended WHP Report, R. at 313, 316).[1] William lost control of his vehicle. Following an investigation, Trooper Chapman of the Wyoming Highway Patrol ("WHP") reported:

I observed a Maroon passenger vehicle on its right side lying nearly perpendicular to the roadway. The vehicle was later identified as a 1996 Chevrolet Cavalier .... It was approximately halfway off the west edge of the road. The decedent, Mr. William M. Caldwell, ... was lying face down in the middle of the road approximately 12.5 feet from the vehicle.

1. Citations to the record can be found at ECF Nos. 57–1 and 57–2 (Unum Claim File).

There was a line of debris from the east shoulder to the vehicle.

... I completed a forensic mapping of the scene .... The roadway is constructed of hard-packed dirt and rock road base, with some loose gravel on the surface, especially near the roadway edges.... The vehicle had been traveling northeast. In this direction of travel, there is a downhill grade with a left curve leading into a more gentle right curve. The posted speed limit at the junction with Carbon County Road 340 is 35 miles per hour.

I observed the marks near the top of the hill leading into the left curve.... The vehicle's rear tires began to track outside the front tires as the vehicle was steered left in an attempt to maintain the road. At the west edge, the vehicle straightened, then the vehicle's rear tires began to track outside the front tires again as it was steered right.... The vehicle exited the roadway on the east side at approximately 45 degrees.... The vehicle traveled through the air over the bottom of the ditch and collided at an angle with the embankment on the opposite side. The collision caused the vehicle's right side to rebound upward, vaulting the vehicle approximately 30 feet, and causing it to come back down on at least one left side tire. The vehicle traveled in this manner for approximately 70 feet as it began to rotate counter-clockwise. The vehicle then tripped and overturned, leading with the passenger side, for approximately 150 feet before coming to rest on its left side. Mr. Caldwell was completely ejected ....

The placement of the tire marks are consistent with negotiating a curve at higher speeds or "cutting the corner"

.... Using a conservative drag factor of 0.5, and assuming the brakes were functioning normally, a mathematical analysis results in speeds of 75 miles per hour at the first middle ordinate, and 72 miles per hour at the second.

An examination of the vehicle showed that the driver's restraint was not in use and the airbags did not deploy....

Mr. Caldwell's vehicle was traveling too fast for the road conditions. There was not enough friction present to allow the vehicle to stay on the roadway at the speed it was traveling. Once off the roadway, the vehicle overturned several times and Mr. Caldwell was ejected....

*Id.* at 103, 316–17. William died in the resulting one-vehicle crash.

On July 29, 2015, Plaintiffs filed a claim for accidental death and dismemberment ("AD & D") benefits under a policy of group insurance Unum issued to William's employer, Sinclair Services Company (the "Policy").[2] Relying on the initial WHP Report—which, despite the officer's narrative, indicated a posted speed limit of 30 mph and estimated speed of William's vehicle of 61 mph (*see* R. at 105)—Unum ultimately denied Plaintiffs' claim pursuant to a Policy exclusion which provides: "Your plan does not cover any accidental losses caused by, contributed to by, or resulting from ... an attempt to commit or commission of a crime." ("Crime Exclusion") (R. at 76–77). In its initial denial letter dated October 8, 2015, Tracy McKenzie, a Unum Benefits Specialist, advised Plaintiffs: "In the state of Wyoming, speeding is a misdemeanor per Wyoming Statute Ann. § 31–5–1201 (a) & (d)(iv). Your son's act of speeding was a violation of the law; thus, a crime." (R. at 238.)

**2.** Plaintiffs also filed a life insurance claim which Unum paid on or around August 20, 2015.

By letter dated January 4, 2016, Plaintiffs—represented by counsel—appealed Unum's determination, arguing that the legal speed limit on the road where the accident occurred was 55 mph, not 30 or 35 mph.[3] The appeal also asserted, *inter alia*, that "[s]peeding alone, even well over the legal speed limit, does not rise to the 'commission of a crime' as specified in the policy." (R. at 260, 262.) By letter dated January 12, 2016, Unum Lead Appeals Specialist, Denise Legendre, asked Plaintiffs' attorney to provide additional information to complete the appellate review, including a corrected traffic report to support Plaintiffs' contention that the WHP Report contained inaccurate information. (R. at 304.) By letter dated February 10, 2016, Plaintiffs' attorney provided an amended Traffic Crash Report from WHP. (R. at 306.) Trooper Chapman's amended report contained the same narrative as in his original July 11, 2015 report. (*See* R. at 103, R. at 311.) Trooper Chapman changed the "posted speed" field from 30 mph in his original report to 35 mph in his amended report, and he changed the "estimated speed" field from 61 mph in his original report to 74 mph in his amended report, which is consistent with his original narrative. (R. at 311, 313.)

By letter dated April 8, 2016, Unum notified Plaintiffs' attorney that it had completed the appeal review and determined its initial decision to deny AD & D benefits was correct. (R. at 361–67.) Ms. Legendre explained:

We have determined the evidence supports Mr. Caldwell was speeding, which is a violation noted in Wyoming Statutes. These state statutes constitute speeding as a misdemeanor. A misdemeanor is considered a criminal offense that is less serious than a felony and more serious than an infraction, and is generally punishable by a fine or incarceration in a local jail, or both. His actions (speeding), constitutes an offense that may be prosecuted by state and punishable by law as stated in the Wyoming Statutes.

The policy does not cover this accidental loss because Mr. Caldwell's death was caused by, contributed to by, or resulting from him committing a crime (speeding).

(R. at 362.) Ms. Legendre summarized the information that supported her decision, including the WHP crash report finding Mr. Caldwell was traveling 74 mph at the time of the crash and was driving too fast for the conditions. She explained that "Mr. Caldwell was driving 39 miles per hour over the posted 35 mile per hour limit and 19 miles per hour over [the] 55 mile per hour [limit] where the roadway is unpaved." (R. at 364.) She further explained that "[w]e do not concur that Mr. Caldwell was committing a 'minor traffic infraction.'" (R. at 366.) Ms. Legendre further advised Plaintiffs that "[i]f you have additional information that verifies under Wyoming Motor Vehicle Regulations/Statutes that speeding is not a crime, please submit this written verification within 30 days ...." *Id.*

Plaintiffs' counsel responded by letter dated May 2, 2016, not disputing that speeding is a misdemeanor under Wyoming law but, rather, arguing that "[t]here is no possibility of a jail sentence in Wyoming for going 74 mph in a 55 mph zone." (R. at 369.) Plaintiffs further argued, "Even if speeding is technically a 'criminal act,' as the relevant statute does say violations of the provisions of the act are a misdemeanor, there is absolutely no way any reasonable person would understand the criminal exclusion ... to cover the act

3. Plaintiffs' counsel pointed out that the posted speed limit was 35 mph, not 30 mph as indicated in the "posted speed" field in the WHP Report.

of speeding in a motor vehicle." (R. at 370.) By letter dated May 16, 2016, Ms. Legendre notified Plaintiffs' attorney that Unum was "adhering to [its] decision that the accidental death claim is excluded from coverage under the policy." (R. at 402.) Ms. Legendre again explained:

We are upholding the denial under the crime exclusion. Speeding is a crime under Wyoming law (Wyo. Stat. Ann. § 31–5–1201(a) in violation of § 31–5–301(b)(iv)(55 mph on unpaved road) or 31–5–302 or 303 (posted speed limit)). It also is a crime under the dictionary definition of "crime." See discussion of the dictionary definition of crime in Harrison v. Unum, 2005 WL 827090 (D.N.H. 2005).

Regardless of whether Mr. Caldwell was going 72 or 74 miles per hour on a gravel road, and regardless of whether the speed limit was 35 or 55, he was committing a crime.... More importantly, it is a crime that caused, contributed to, or resulted in the loss.

*Id.* This lawsuit followed.

In their Complaint, Plaintiffs allege the plain and ordinary meaning of the phrase "attempt to commit or commission of a crime" does not include a motor vehicle accident involving speeding, and a reasonable person would not consider speeding a crime. (Compl. 24 & 25.) Therefore, Plaintiffs contend, Unum breached the terms of the Policy by denying benefits to Plaintiffs based on the Crime Exclusion. The Policy at issue is governed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461. (*See* Compl. ¶ 4.)

#### STANDARD OF REVIEW

■ Where both parties move for summary judgment in an ERISA case, "summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor." *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment and Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (internal quotation marks and citation omitted). The Court must first determine the appropriate standard to be applied to Unum's decision to deny benefits. *Id.*

" '[A] denial of benefits' covered by ERISA 'is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.' *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Where the plan gives the administrator discretionary authority, however, 'we employ a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious.' *Weber [v. GE Group Life Assurance Co.*, 541 F.3d 1002,] 1010 (internal citation, quotation omitted). Under this arbitrary-and-capricious standard, our 'review is limited to determining **whether the interpretation of the plan was reasonable and made in good faith**.' *Kellogg [v. Metro., Life Ins. Co.*, 549 F.3d 818,] 825–26 (internal alterations, quotations omitted).

*LaAsmar*, 605 F.3d at 796(emphasis added).

■ The parties agree Unum's decision is reviewed under the arbitrary and capricious or abuse of discretion standard because the Policy grants Unum discretion and final authority to construe and interpret the terms of the Policy. *See Cardoza v. United of Omaha Life Ins. Co.*, 708 F.3d 1196, 1201 (10th Cir. 2013). "Certain indicia of an arbitrary and capricious denial of benefits include lack of substantial evidence, mistake of law, bad faith, and con-

flict of interest by the fiduciary." *Id.* at 1201–02. Because Unum acts as both the claims administrator and payor of benefits, the Court should weigh that conflict as "a factor" in determining whether the denial of benefits was an abuse of discretion, "according it more or less weight depending on its seriousness." *Id.* at 1202 internal quotations and citation omitted). "A conflict is more important when circumstances suggest a higher likelihood that it affected the benefits decision, but less so when the conflicted party has taken active steps to reduce potential bias and to promote accuracy." *Id.* (internal quotations and citation omitted).

 Plaintiffs argue the inherent conflict of interest created by the mere fact that Unum acts in a dual role by both evaluating and paying claims was "compounded when claims personnel were 'forced' to rely solely on DLRs [in-house lawyers] to provide guidance on contract interpretation." (Pls.' Mem. in Supp. of Mot. for Summ. J. at 19.) Plaintiffs contend this somehow created a conflict because, as claims fiduciaries, Ms. McKenzie and Ms. Legendre owed a duty of loyalty to the plan beneficiaries as opposed to Unum. *Id.* However, there is no evidence the claims examiners were required to follow the DLRs' advice, nor do Plaintiffs cite any legal authority for the proposition that Unum's reliance on DLRs was somehow improper. Moreover, the fiduciary duties that accompany claims administration do not require administrators to defer to claimants' interpretations or arguments. A plan administrator does not breach its fiduciary duty to a "simply by interpreting a plan provision in a manner that results in a denial of the beneficiary's claims." *Joseph F. v. Sinclair Serv's. Co.*, 158 F.Supp.3d 1239, 1253 (D. Utah 2016).

[A] fiduciary obligation, enforceable by beneficiaries seeking relief for themselves, does not necessarily favor payment over nonpayment. The common law of trusts recognizes the need to preserve assets to satisfy future, as well as present, claims and requires a trustee to take impartial account of the interests of all beneficiaries.

*Varity Corp. v. Howe*, 516 U.S. 489, 514, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). *See also Foster v. PPG Indus., Inc.*, 693 F.3d 1226, 1238 (10th Cir. 2012) ("the Plan Administrator's decision was consistent with its fiduciary obligation to safeguard Plan assets for the benefit of all participants, not just Foster").

 "[O]nce [an ERISA] plan is established, the administrator's duty is to see that the plan is 'maintained pursuant to [that] written instrument.'" *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, —— U.S. ——, 134 S.Ct. 604, 612, 187 L.Ed.2d 529 (2013) (quoting 29 U.S.C. § 1102(a)(1)). Under a deferential standard of review, "the plan administrator's interpretation of the plan 'will not be disturbed if reasonable.'" *Conkright v. Frommert*, 559 U.S. 506, 521, 130 S.Ct. 1640, 176 L.Ed.2d 469 (2010) (quoting *Firestone*, 489 U.S. at 111, 109 S.Ct. 948). As the Supreme Court specifically held in *Conkright*, these principles are critical to the fundamental interests at the heart of ERISA:

Congress enacted ERISA to ensure that employees would receive the benefits they had earned, but Congress did not require employers to establish benefit plans in the first place. *Lockheed Corp. v. Spink*, 517 U.S. 882, 887, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996). We have therefore recognized that ERISA represents a " 'careful balancing' between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 215, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004) (quoting *Pilot Life*

*Ins. Co. v. Dedeaux*, 481 U.S. 41, 54, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987)). Congress sought "to create a system that is [not] so complex that administrative costs, or litigation expenses, unduly discourage employers from offering [ERISA] plans in the first place." *Varity Corp., supra*, at 497, 116 S.Ct. 1065. ERISA "induc[es] employers to offer benefits by assuring a predictable set of liabilities, under uniform standards of primary conduct and a uniform regime of ultimate remedial orders and awards when a violation has occurred." *Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 379, 122 S.Ct. 2151, 153 L.Ed.2d 375 (2002).

*Firestone* deference protects these interests and, by permitting an employer to grant primary interpretive authority over an ERISA plan to the plan administrator, preserves the "careful balancing" on which ERISA is based. Deference promotes efficiency by encouraging resolution of benefits disputes through internal administrative proceedings rather than costly litigation. It also promotes predictability, as an employer can rely on the expertise of the plan administrator rather than worry about unexpected and inaccurate plan interpretations that might result from *de novo* judicial review. Moreover, *Firestone* deference serves the interest of uniformity, helping to avoid a patchwork of different interpretations of a plan, like the one here, that covers employees in different jurisdictions—a result that "would introduce considerable inefficiencies in benefit program operation, which might lead those employers with existing plans to reduce benefits, and those without such plans to refrain from adopting them." *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 11, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987).

*Conkright*, 559 U.S. at 516–17, 130 S.Ct. 1640.

As further evidence of a conflict of interest Plaintiffs offer Unum's practice of paying Performance Based Incentives to employees based on the overall financial results of the company, a component of which is dependent upon the employee's performance. (*See* Unum Ex. F–5.) Specifically, Plaintiffs reference Unum's use of "overpayments" as one such performance measure for Benefit Specialists like Ms. McKenzie, and argue there is no similar metric for underpayments. (Pls.' Memo, in Supp. at 21.) Ms. McKenzie was given an overall performance quality score of 74.9% relating to a 2014 Texas claim involving an overpayment where the accident was the claimant's fault for failing to yield to an oncoming truck. The overpayment was based on Ms. McKenzie's assumption that the claimant was a vehicle passenger when apparently the claimant was the driver. Plaintiffs argue this circumstance evidences a bias toward denying claims where the insured is at fault even if the policy only excludes accidents caused by commission of a crime rather than the insured's negligence. The Court finds insufficient grounds to make such an inference.

In *Metropolitan Life Ins. Co. v. Glenn*, the Supreme Court suggested administrators can reduce conflict "by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." 554 U.S. 105, 117, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008). Unum produced evidence showing active steps it has taken to minimize the impact of conflict, including "walling off" claims handlers from personnel in finance and penalizing inaccurate decision-making (*see* Unum Ex. F). As the quality audit itself makes clear, the feedback to Ms. McKenzie was that the investigation was incomplete because the auditor could not rule

out that a policy exclusion might apply (Unum Ex. F–10 at 0139). Contrary to Plaintiffs' assertion, the Quality Audit simply evidences Unum's efforts to penalize inaccurate or incomplete decision-making. The audit contains several metrics on which a claim is evaluated, including Eligibility, Customer Service, Information Gathering, Payment Accuracy, and the overall accuracy of the decision (*id.* at 0003). With respect to Payment Accuracy, the sub-categories include: Were benefits calculated and paid correctly? Were all benefit enhancements calculated and paid correctly per the policy language? Were all overpayments identified and handled? Were all *underpayments* identified and handled? (*Id.* at 0009.) In fact, audit feedback in the record identifies both underpayments and overpayments. (*Id.* at 0012, 0055, 0066.)

Plaintiffs have failed to demonstrate that conflict was an important factor in Unum's decision to deny benefits to Plaintiffs. The record shows Unum has taken steps to reduce potential bias and to promote accuracy. The claims evaluators sought the advice of counsel and conducted an investigation. Plaintiffs were allowed to appeal the decision and submit additional information and argument (twice) in support of their claim. Thus, while the Court will consider Unum's inherent conflict of interest as a factor in determining whether its decision was arbitrary and capricious, the Court will accord the conflict little weight in making that determination. *See Foster*, 693 F.3d at 1232–33. *See also Cardoza*, 708 F.3d at 1202–03. *See also Conkright*, 559 U.S. at 513, 130 S.Ct. 1640 ("a systemic conflict of interest does not strip a plan administrator of deference"); *Adamson v. Unum Life Ins. Co. of America*, 455 F.3d 1209, 1213 (10th Cir. 2006) ("The fact that UNUM administered and insured the group term life insurance portion of this plan does not on its own warrant a further reduction in deference.").

## DISCUSSION

The issue here is whether Unum's interpretation of "crime" to include speeding for purposes of the Crime Exclusion was reasonable and made in good faith. In interpreting an ERISA plan, the Court must look to the terms of the plan and, if unambiguous, construe them as a matter of law. *Cardoza*, 708 F.3d at 1203; *Foster*, 693 F.3d at 1237. "In making this determination, [the] court 'consider[s] the common and ordinary meaning as a reasonable person in the position of the plan participant would have understood the words to mean.'" *Cardoza*, 708 F.3d at 1203 (quoting *Scruggs v. ExxonMobil Pension Plan*, 585 F.3d 1356, 1362 (10th Cir. 2009)). Both the Plaintiffs and Defendant in this case contend the term "crime" is not ambiguous—yet each side ascribes the term a different meaning. Plaintiffs insist, when given its common and ordinary meaning as a reasonable person in the position of the plan participant would have understood the word to mean, "crime" does *not* include speeding. (Pls.' Memo, in Supp. at 1–2.) On the other hand, Defendant maintains the common and ordinary meaning of "crime" undisputedly includes speeding as it is a violation of Wyoming law. (Unum's Opp'n to Pls.' Mot. at 11.) "That judges and lawyers, who by education and experience are primed to discover ambiguity in contract language, might find gaps or contradictions in a summary plan description's ordinary, conversational language does not mean that the language is necessarily ambiguous or silent to the point of default for ERISA purposes." *Sunbeam–Oster Co., Inc. Group Benefits Plan v. Whitehurst*, 102 F.3d 1368, 1376 (5th Cir. 1996).

The term "crime" is not ambiguous. Although there are certainly varying degrees of crime—obviously some being more serious than others in most people's

minds and in the eyes of the law—reasonable persons understand the term to mean a violation of the law. Courts routinely look to dictionary definitions in determining the common and ordinary meaning of an undefined term. *See, e.g., Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 132 S.Ct. 1997, 2002–03, 182 L.Ed.2d 903 (2012); *In re Mallo*, 774 F.3d 1313, 1321 (10th Cir. 2014) (dictionary definitions are "useful touchstones" to determine an undefined term's ordinary and common meaning); *Fruitt v. Astrue*, 604 F.3d 1217, 1220 (10th Cir. 2010) (the court may "consult a dictionary to determine the plain meaning of a term"); *Cummings v. Minnesota Life Ins. Co.*, 711 F.Supp.2d 1287, 1294 (N.D. Okla. 2010) (court looked to dictionary definition of "drug" to determine its common and ordinary meaning for purposes of ERISA policy exclusion).

Black's Law Dictionary defines "crime" as: "An act that the law makes punishable." *Crime*, BLACK'S LAW DICTIONARY (10th ed. 2014). *See also Crime*, BLACK'S LAW DICTIONARY (6th ed. 1991) ("a positive or negative act in violation of penal law"). Likewise, the Merriam–Webster Dictionary defines "crime" as: "an illegal act for which someone can be punished by the government." *Crime*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/crime (last visited Sept. 18, 2017). Driving in excess of the established maximum speed limit, or at a speed greater than is reasonable and prudent under the conditions, is a violation of Wyoming law, which classifies such a violation as a misdemeanor. WYO. STAT. §§ 31–5–301(a) & (b), 31–5–1201(a). Further, a speeding violation is punishable by a fine, imprisonment (for not more than six months), or both. *Id.* § 31–5–1201(b) & (d). Wyoming expressly classifies "misdemeanors" as crimes. *See* WYO. STAT. § 6–10–101 ("Crimes which may be punished by death or by imprisonment for more than one (1) year are felonies. All other crimes are misdemeanors."). Similarly, Black's defines "misdemeanor" as: "A crime that is less serious than a felony and is usu[ally] punishable by fine, penalty, forfeiture, or confinement (usu[ally] for a brief term) in a place other than prison (such as a county jail)." *Misdemeanor*, BLACK'S LAW DICTIONARY (10th ed. 2014). Therefore, Unum's interpretation of "crime" is consistent with the ordinary and unambiguous meaning of the term.

Plaintiffs contend that, because most people view speeding as a minor traffic violation and not a serious crime, Unum's interpretation is contrary to the common and ordinary meaning a reasonable Sinclair employee would have understood the word to mean.[4] However, Plaintiffs cite no authority or factual support for their proposition that, to reasonable people (or even reasonable Sinclair employees) the common and ordinary meaning of crime is something more serious than simple traffic infractions. And the fact that some level of speeding may be generally accepted as normal in Wyoming does not establish that reasonable people

4. Plaintiffs further argue that the doctrine of *contra proferentem* required Unum to resolve any ambiguity in Policy terms in favor of the beneficiary. However, the Tenth Circuit has held that "when a plan administrator has discretion to interpret the plan and the standard of review is arbitrary and capricious, the doctrine of contra proferentem is inapplicable." *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1100 (10th Cir. 1999). *See also Miller v. Monumental Life Ins. Co.*, 502 F.3d 1245, 1253 (10th Cir. 2007) ("We have rejected contra proferentem in cases where the plan administrator retains discretion and where we review only to consider whether the administrator abused discretion."). Likewise, Plaintiffs have cited no direct authority requiring Unum to apply *contra proferentem* when interpreting Policy terms in the first instance.

don't understand speeding to be a crime. Moreover, even if Plaintiffs' interpretation suggests ambiguity in the term, "[a] decision denying benefits based on an interpretation of an ERISA provision survives arbitrary and capricious review so long as the interpretation is reasonable." *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1193 (10th Cir. 2007), *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008). Unum's decision "need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within [its] knowledge to counter a claim that it was arbitrary or capricious. The decision will be upheld unless it is not grounded on any reasonable basis." *Hancock v. Metro. Life Ins. Co.*, 590 F.3d 1141, 1155 (10th Cir. 2009) (internal quotation marks omitted) (quoting *Finley v. Hewlett–Packard Co. Employee Benefits Org. Income Prot. Plan*, 379 F.3d 1168, 1176 (10th Cir. 2004)). In other words, "[w]hen a plan administrator is given authority to interpret the plan language, and more than one interpretation is rational, the administrator can choose any rational alternative." *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1100 (10th Cir. 1999).

Plaintiffs assert that, if the Court finds ambiguity in the term "crime," it should look to Unum's Claims Manual to determine Unum's intent in applying the Crime Exclusion. The Claims Manual provides the following guidance for application of the Crime Exclusion:

When administering a crime exclusion, consider the following:

- "Attempt to commit" or "commission" policy language was intended to exclude [ ]losses which result from an activity that would typically be classified as a crime (or felony, depending on policy language) under state or federal law.

- "Attempt to commit" or "commission" policy language was not intended to apply to activities which would generally be classified as traffic violations.

- We will generally exclude benefits on claims where a [ ]loss results from the claimant's operating under the influence or driving while intoxicated since these offenses are typically classified as crimes (or felonies, depending on the policy language).

- Consult with a DLR [dedicated legal resource] if you question whether or not the circumstances of a claim and the policy language support a denial of benefits on the basis of the crime exclusion.

- **Reminder: Each claim is unique and should be evaluated on its own merits. The actual policy governing the claim must be referenced.**

(ECF No. 55–3 at 1–2) (underlined emphasis added) (bold emphasis in original). Plaintiffs argue this guidance evidences Unum's intent to ensure the term "crime" is interpreted consistent with the understanding of a reasonable insured and, because Unum's interpretation in this case is contrary to the Claims Manual guidance, Unum abused its discretion and denied Plaintiffs' claim in bad faith. The Court is unconvinced. To the extent the Claims Manual is relevant here, Unum's decision is not inconsistent with the guidance provided therein. First, in addition to the reminder set forth above, Unum's Claims Manual further cautions: "The Claims Manual is not intended to offer a prescribed answer to each claim situation. Rather, such answers must be arrived at based on the specific and particular facts of the claim. Each claim is unique and must be evaluated on its own merits." (*Id.* at 7.) Second, the Claims Manual is not the Policy and cannot override the Policy

terms. *See Wade v. Life Ins. Co. of North Am.*, 271 F.Supp.2d 307, 324 (D. Me. 2003) (the manual is "not part of the SPD or other Plan documents central to Plaintiff's appeal ... [and] ... is peripheral to any interpretation of the Plan"). Nothing in the record supports a finding that the conduct at issue in this case—speeding at least 17 mph over the legal limit on an unpaved road—is "generally classified as a traffic violation," particularly where a causal nexus to the loss is sufficient to implicate the Crime Exclusion.

 Unum's interpretation of "crime" to include speeding for purposes of applying the Crime Exclusion to Plaintiffs' AD & D claim was reasonable and made in good faith. Speeding is undisputedly a violation of Wyoming law and thus, a crime. The record shows William was speeding—at least 17 mph and arguably 39 mph over the speed limit—and his excessive speed "caused, contributed to, or resulted in" the accident. While perhaps viewed as unreasonable by some, under the deferential standard of review a court "will not substitute its judgment for that of an administrator so long as the administrator's decision falls 'somewhere on the continuum of reasonableness—even if on the low end.'" *Joseph F.*, 158 F.Supp.3d at 1254 (quoting *Kimber*, 196 F.3d at 1098). Accordingly, Unum's denial of the Plaintiffs' claim for AD & D benefits based in its interpretation of "crime" was not arbitrary and capricious.

### CONCLUSION

The terms of the AD & D policy and the evidence in the administrative record show Unum's denial of benefits to Plaintiffs was reasonable and made in good faith. THEREFORE, it is hereby

ORDERED that *Unum's Motion for Summary Judgment or in the Alternative Motion for Judgment on the Record* (ECF No. 54) is GRANTED; it is further

ORDERED that *Plaintiffs' Motion for Summary Judgment* (ECF No. 56) is DENIED; it is further

ORDERED that *Plaintiffs' Motion to Strike Defendant's Supplemental Authority* (ECF No. 72) is DENIED.